The Rushville National Bank of Rushville, Trustee et al. *v.* The State Life Insurance Company.

[No. 26,704. Filed April 29, 1936. Rehearing denied October 21, 1936.]

*Owen S. Boling, Russell B. Titsworth,* and *Harold J. Titsworth,* for appellants.

*John H. Kipliner, Milton W. Mangus,* and *Joseph A. McGowan,* for appellee.

FANSLER, J.—Appellee began this action in equity to cancel and rescind a life insurance policy upon the life of Walter Emsweller, upon the ground that the insured had concealed a material fact in applying for the policy. There was a second paragraph of complaint, which we need not notice. There were answers in general denial, the cause was submitted to the court, and there was judgment for appellee canceling and annulling the policy. A motion for a new trial was overruled, which ruling is the basis of the only errors assigned.

The complaint alleges that Walter Emsweller applied to the plaintiff for a policy of insurance on his life in the amount of $5,000; "that in said application for that insurance the said Walter Emsweller in the blank calling upon him to state the death of any deceased brother, did not state the death of a brother who had died just a few months prior, which said brother died insane and by suicide, that said facts of said brother's death were then and there well known to the said Walter Emsweller; in fact, plaintiff is now informed that the said Walter Emsweller so worried over the death of that brother that he himself became mentally deranged, and died of such insanity; that said facts so known to the said Emsweller and so con-

cealed from plaintiff were material, and had they been known to plaintiff, plaintiff would not have issued an insurance policy upon said application; that plaintiff, relying upon the truth of said application, in pursuance to said application, issued to said Walter Emsweller its policy."

It appears from the evidence that, in December, 1930, when he applied for the policy, the applicant was forty-four years of age; that he was a farmer and road-building contractor, residing near the town of New Salem, in Rush county; and that, for some time prior thereto, he had been in partnership with appellant Arthur H. George in the business of quarrying gravel and stone for road building and other purposes. Chester George, a lawyer and brother of Arthur H. George, was attorney for the partners and also agent for appellee. At about the time of the application for this policy, the partners agreed that each should procure a policy of insurance on his life in the sum of $5,000, the premiums to be paid out of partnership funds, and the policies to be assigned to the Rushville National Bank, as trustee, pursuant to a written contract, by the provisions of which the bank, upon the death of a partner, should collect the proceeds of the policy and use them in purchasing the deceased partner's interest in the partnership property for the benefit of the surviving partner. The policy, when issued on January 2, 1931, was made payable to Emsweller's estate. It was assigned to the bank, as trustee, and, thus, appellant Arthur H. George, brother of the company's agent, became the principal beneficiary under the policy, which fact was unknown to appellee at the time. Chester George drew up and prepared the contract involving the insurance. On December 22, 1930, the partners went to his office and filled out an application for the insurance. The two Georges testified that this occurred in Rushville, late in

the afternoon, and that, at about 5 o'clock, Chester George telephoned the offices of Drs. Kennedy and Logan, the regular examining physicians of appellee, and was unable to get them on the telephone. The doctors both testified that they were in Rushville during the entire day and evening of that day. There was no effort to locate them at their homes. Chester George then immediately called the office of Dr. Metcalf, who was, and had been for twenty-five years, the family physician of Emsweller, and Emsweller proceeded to Dr. Metcalf's office for a physical examination. In answer to an inquiry from appellee, before the policies were issued, Chester George replied that the company's regular examiners were not employed for the reason that they were not available when the applicant was ready to be examined.

Chester George, Dr. Metcalf, and appellant Arthur H. George were familiar with the fact that, within a few months prior to the application for insurance, a brother of the applicant Emsweller committed suicide while insane. Chester George testified that, before going to the office of Dr. Metcalf, he prepared a family history, setting out the names of the brothers and sisters of Emsweller, which he took from an application for insurance made some time before; that he handed this family history to Dr. Metcalf, and told him the date on which it was made, and suggested that the ages could be corrected by adding the difference in years. Dr. Metcalf at first testified that no such list was given him; that he did not need it, since he personally knew the family history, but afterwards seemed in doubt about the question. The application, when filed with the company, did not disclose the death of the brother above referred to. The following is a photostatic copy of that part of the application which refers to the family history:

| 7 a. Family History | Age if Living | Health—Good or Bad (if not good, give full details) | Age at Death | Cause of Death | How Long ill | Year of Death | b. Have any of those mentioned under Family History, or any one in your household ever had Tuberculosis? (Give full details.) |
|---|---|---|---|---|---|---|---|
| Father | | | 60 | diabetis | 3 days | 96 | No |
| Mother | 81 | Good | | | | | |
| Brothers 4 | 69 | Good | | | | | |
| ... | 61 | Good | | | | | |
| ... | 48 | Good | | | | | |
| Sisters 3 | 46 | Good | | | | | |
| ... | 43 | Good | | | | | |
| | 42 | Good | | | | | |

If the family history had been correctly given in the former insurance application, from which Chester George says he copied it, the brother who had since died was either accidentally or purposely omitted, in copying or by Dr. Metcalf in filing the blank. Chester George testified that he told Dr. Metcalf, at the time of the examination, to show the death of the brother Elmer, who had suicided while insane, and that the applicant Emsweller also reminded the doctor to insert in the application the fact of his brother's death, which was not done. Appellants' witnesses testified that at the time Emsweller signed the application it had all been filled out, except the family history, which was filled in by Dr. Metcalf later.

Afterwards, and before the policy was issued, Chester George called upon the chief medical examiner of appellee. He testified that the medical examiner made some question about the application on account of an abnormal difference between the systolic and diastolic blood pressure, and suggested a re-examination, and that George then suggested that, rather than a re-examination, the policy be written at the higher rate provided for such conditions. George then testified that he thought he mentioned the death of the brother to the medical examiner, and said: "As I recall it, I made the statement that the only objection that I saw to the policy was the suicide of his brother." This was positively denied by the chief medical examiner. George also testified that he had knowledge of the fact that another brother of the applicant was mentally deficient. Dr. Metcalf testified that nothing was said to him at the

time of the application, either by Emsweller or George, concerning the suicide of the applicant's brother, but that he had personal knowledge of the facts and the entire family history at the time, and that he did not recall whether he had put it in the application or not. He testified that he had known and been connected with the Emsweller family for twenty-five years, and that he had examined other members of the family, and was familiar with the family history.

On April 23, 1931, an insanity inquest was held on the assured, and he was found to be of unsound mind, and was committed to an institution, and on May 13, 1931, less than five months after the policy was issued, he died.

It is contended by appellants that the application filed with the company discloses the fact that there is one brother unaccounted for, and that the company must be charged with knowledge of that fact and with having waived information concerning that brother. But assuming, as the trial court evidently did, that the application was prepared, as it is, designedly and pursuant to a plan to deceive appellee, it was necessary to the success of the fraudulent plan that there be some basis for such a contention as is now made.

The application blank makes it clearly appear that the company desired to know whether any of the brothers or sisters of the applicant were dead, the cause of death, the length of illness, and the year of death. It is equally clear that in examining the application the company's representatives would be principally concerned with the facts concerning the members of the family who are dead. It would be observed that the father's age at death was given, the cause of death, and the length of illness, and, when it was observed that the remaining members of the family were living and in good health, and that no others were shown to be dead, there would be but little

concern as to the number of brothers and sisters. The figures, after the words "brothers" and "sisters", in the first column, were not required by the form, and the fact that the number of brothers and sisters who are listed as living and in good health does not correspond with these figures might be overlooked, even upon a reasonably careful examination which had for its purpose the discovery of information concerning the members of the family who were in bad health or who had died. It would be noted that the blank had been filled in in the handwriting of the examining doctor, and not of the applicant, and the discrepancy might be attributed to an error in adding the number concerning whom details had been given. There is evidence that the appellee had no actual knowledge that one brother was dead. There was ample evidence from which it might be concluded that the information was deliberately, intentionally, and fraudulently withheld for the purpose of concealing it.

A waiver is the voluntary and intentional relinquishment of some known right. *Farmers' Insurance Association* v. *Males* (1924), 82 Ind. App. 172, 145 N. E. 446. But, in addition to an express waiver, which is based on actual knowledge and voluntary and intentional relinquishment, a waiver is sometimes implied, and in cases involving insurance applications where there is an obvious failure to furnish information requested, and the policy is issued notwithstanding, the company is treated as having waived the information. It is said in *Insurance Company* v. *Wolff* (1877), 95 U. S. 326, 333, that: "The doctrine of waiver, as asserted against insurance companies to avoid the strict enforcement of conditions contained in their policies, is only another name for the doctrine of estoppel. It can only be invoked where the conduct of the companies has been such as to induce action in reliance upon it, and where

it would operate as a fraud upon the assured if they were afterwards allowed to disavow their conduct and enforce the conditions. To a just application of this doctrine it is essential that the company sought to be estopped from denying the waiver claimed should be apprised of all the facts: of those which create the forfeiture, and of those which will necessarily influence its judgment in consenting to waive it. The holder of the policy cannot be permitted to conceal from the company an important fact, like that of the insured being in *extremis,* and then to claim a waiver of the forfeiture created by the act which brought the insured to that condition. To permit such concealment, and yet to give to the action of the company the same effect as though no concealment were made, would tend to sanction a fraud on the part of the policyholder, instead of protecting him against the commission of one by the company."

It is said in *Penn Mutual Life Insurance Co.* v. *Wiler* (1885), 100 Ind. 92, 98, 99, that:

"If the answer given to any interrogatory be in itself true, though the question be such as to suggest a fuller and more detailed answer, yet, if the insurer be content with the partial answer, he cannot claim a warranty extending beyond the partial answer. Warranties in insurance policies are always strictly construed.

"If the answer to any of the many questions propounded to the applicant was in itself untrue, there was a breach of warranty. If all the answers were true, there was no breach of warranty, and the general provision following the questions and answers in the application could not make this otherwise. We think it would not be understood by the applicant from those general provisions, that if all his answers were true, and honestly made, the policy should be void for an unintentional omission of some fact without which some answer was not full. If the answers were true in themselves,

and there was no intentional suppression or omission, no fraud on his part, his answers should not be held to avoid the policy." See also, *Phoenix Life Insurance Co.* v. *Raddin* (1887), 120 U. S. 183, 7 S. Ct. R. 500.

It is apparent from the language quoted that good faith upon the part of an applicant is contemplated where the waiver, or estoppel to deny waiver, is enforced, and this is consistent with the sound doctrine that estoppel is only available in defense of a claim made in good faith. It can never be asserted to uphold fraud. Estoppel is grounded upon equity and good conscience, and a waiver which is not shown to have been voluntary and intentional in fact can only be constructed through estoppel to prevent injustice and unconscionable advantage. It is inconsistent with these basic principles to permit one who has designed a plan calculated to deceive and defraud, and who is discovered before the fraud is occomplished, to claim a waiver and estoppel to deny it, as an aid in accomplishing his fraudulent purpose upon the theory that, although his intended victim had not discovered the deception, and had no actual knowledge, and had not intentionally waived knowledge, he should nevertheless be charged therewith because the plan of deception was poorly and awkwardly designed and should have failed to accomplish its purpose. One may not construct a pitfall and charge the victim's entrapment to his own negligence in failing to see the trap.

It is said in *Western Manufacturing Co.* v. *Cotton & Long* (1907), 126 Ky. 749, 755, 104 S. W. 758, 12 L. R. A. (N. S.) 427: "Whether the victim is actually misled is always an essential inquiry, and that the means of knowledge were open to him, were indeed easily available, and nothing but gross negligence would have failed to discover the falsehood, do not preclude an inquiry into the truth as to whether he in fact had the

knowledge, and was in fact misled by the stratagem of his adversary. The law is not designed to protect the vigilant, or tolerably vigilant, alone, although it rather favors them, but is intended as a protection to even the foolishly credulous, as against the machinations of the designedly wicked." Continuing, it is said: ". . . it is not just that a man who had deceived another should be permitted to say to him: . . . 'You yourself were guilty of negligence'."

It was said by the Supreme Court of Illinois in *Linington* v. *Strong et al.* (1883), 107 Ill. 295, 303: ". . . we consider that where it appears that one party has been guilty of an intentional and deliberate fraud, by which, to his knowledge, the other party has been misled, or influenced in his action, he cannot escape the legal consequences of his fradulent conduct by saying that the fraud might have been discovered had the party whom he deceived exercised reasonable diligence and care." The principle involved was recognized by this court in *Whitesell et al.* v. *Strickler et al.* (1906), 167 Ind. 602, 618, 78 N. E. 845, 850, when it was said: "Equity will not permit a wrongdoer, while retaining the fruits of his wrong, to interpose an act, intentionally and wrongfully induced by him, as an estoppel against the injured party in an action for redress. One seeking equity must be able to show that he himself has clean hands."

Nor can it be said, as a matter of law, that a reasonably careful examination of the application, by a reasonably prudent man, would have disclosed that there is a brother unaccounted for. This is a question of fact regarding which there is room for a reasonable difference of opinion.

In this case the cancellation of the policy will not operate as a fraud upon the assured or upon appellants.

In view of all the facts, it cannot fairly be said that the insured was induced to action in reliance upon the company's having waived information concerning his dead brother. Knowledge upon the part of its agent and examining officer cannot be imputed to the company where they are shown to have been acting in collusion with the applicant in concealing facts, and there is evidence to support such a conclusion.

Shortly after the death of the insured, appellee notified the beneficiaries, in writing, that because of the fact that the application did not disclose the facts in reference to his deceased brother having committed suicide, the company elected to cancel the policy, and there was a tender of the premium, and the tender was again made in court when this action was brought. It is contended that: "The appellee, having failed in its notice of rescission to appellants, to mention fraudulent collusion between the insured, or the appellants, and appellee's agents, as a ground of rescission of the policy, could not have recovered upon that ground, even had it pleaded it." They rely upon *Vulcan Insurance Co.* v. *Johnson* (1920), 74 Ind. App. 62, 128 N. E. 664, and cases there cited. These cases involve the waiver of notice of loss or of other conditions affecting the policy, which were known and understood by the parties at the time liability was denied by the company. But it is clear from the evidence that the facts showing collusion were not disclosed to appellee, nor within its knowledge, until they appeared from the testimony of appellant's witnesses upon the trial, and therefore there is no basis for an application of the waiver doctrine. There was no demurrer to the complaint, nor motion to make more specific. It was not necessary to describe the means by which concealment of the facts in question was accomplished, but, had it been necessary, in the absence of a demurrer, we are on appeal required to

treat the pleadings as amended to conform to the evidence.

Appellants contend that: "The appellee seeks recovery upon the theory that the insured failed to fill in a blank in the application with certain information." But the complaint cannot be so interpreted.

It does not allege a failure to disclose. It alleges concealment. Concealment implies intention. Omission to state a fact may imply only negligence, but the charge that a fact is concealed implies an intention to withhold or cover up information so that the one entitled to be informed may remain in ignorance. Where one has a duty to disclose, concealment implies deceit, and the procurement of a contract through the concealment of facts which one is in duty bound to disclose, amounts to fraud. The facts disclosed in evidence, mostly through the testimony of the appellant's witnesses, and the inferences which may reasonably be drawn therefrom, are sufficient to sustain a finding that the applicant intentionally concealed the fact of the insanity and suicide of his brother, and that there was fraudulent collusion between the insured and Chester George, the agent of appellee, and appellant Arthur H. George, the principal beneficiary of the policy, to accomplish that purpose.

It is contended that there is no presumption that the insured was aware of the incomplete answer in the application. But the insured was chargeable with knowledge of what was in the application, for he was required to sign it, and if he signed it before it was completed, relying upon another to supply information which he knew was required, he is chargeable with knowledge of the contents of the application as finally submitted to the company. It is contended that, in the absence of evidence of bad faith on part of the insured, or of appellants, it is immaterial what the motives of appellee's agents were for suppressing the truth.

But there is evidence from which bad faith, on the part of the insured and appellant Arthur H. George, the principal beneficiary, and Chester George, the agent of the company, may very reasonably be inferred.

Error is predicated upon the admission of certain evidence.

It is asserted that, where there is sufficient competent evidence in the record to sustain the trial court, the admission of incompetent evidence will not require reversal, since the admission of such evidence is harmless when the decision is supported by sufficient competent evidence. *Keener School Twp. et al.* v. *Eudaly* (1932), 93 Ind. App. 627, 175 N. E. 363, and *Pleak et al.* v. *Cottingham, Adm'x* (1932), 94 Ind. App. 365, 372, 178 N. E. 309, are relied upon as authority for this view. In the latter case it is said: "The admission of improper evidence of a fact in issue is harmless when the verdict or judgment is supported by sufficient competent evidence. *Parker* v. *State ex rel.* (1846), 8. Blackf. (Ind.) 292; *Manchester* v. *Doddridge* (1852), 3 Ind. 360; *Parmlee* v. *Sloan* (1871), 37 Ind. 469; *Dickinson* v. *Colter* (1874), 45 Ind. 445; *Marshall* v. *Stewart* (1881), 80 Ind. 189; *Citizens State Bank* v. *Adams* (1883), 91 Ind. 280; *Forbing* v. *Weber* (1885), 99 Ind. 588; *Phenix Ins. Co.* v. *Pickel* (1891), 3 Ind. App. 332, 29 N. E. 432; *Indianapolis St. R. Co.* v. *Schmidt* (1904), 163 Ind. 360, 71 N. E. 201." *Bowers* v. *Headen* (1853), 4 Ind. 318; *Shira et al.* v. *State ex rel. Ham et al.* (1918), 187 Ind. 441, 119 N. E. 833; and *Grasselli Chemical Co.* v. *Simon* (1925), 84 Ind. App. 327, 150 N. E. 617, are cited as supporting a similar statement of the law in *Keener School Twp. et al.* v. *Eudaly, supra.* We cannot approve the view taken by the Appellate Court; and the decisions of this court which are cited as supporting it do not bear such an interpretation. Those cases go no

further than to hold that a judgment will not be reversed, because of the erroneous admission of incompetent evidence, where it appears that appellant was not injured thereby, and that the improper evidence could not have influenced the result. The correct rule, that where illegal evidence was admitted, it must be presumed that it injuriously affected the other party, unless is clearly appears that it did not,. is announced in *Dickinson* v. *Colter,* one of the cases above cited. When the evidence is conflicting, and that which was erroneously admitted tends to support the judgment, we cannot say that it was harmless.

Appellants complain of the ruling of the court in permitting a witness to identify the handwriting of Emsweller upon the application. This was not error and could not have harmed appellants, since the signature is not in dispute. Objection was made to the introduction of the application and certain other exhibits, upon the theory that the complaint does not allege that the application is in writing, and that there is no basis for proof of a written one. But the complaint is not based upon a written instrument; it is based upon a fraud. There was no demurrer, so that, as pointed out, the complaint will, if necessary, be treated as amended to conform to the proof Dr. Kennedy was permitted to testify concerning conversations with Emsweller when he examined him at the insanity inquest. It is contended that this evidence was incompetent, and the case of *Masons' Union Life Ins. Association* v. *Brockman* (1898), 20 Ind. App. 206, 50 N. E. 493, is cited as authority. The ruling in that case is upon the theory that the beneficiary took an immediate interest in the policy when it was issued, and that rights of the beneficiary could not be impaired by an act of the assured performed subsequent to the issuance of the policy. The purpose of the evidence here was doubtless

to establish that the insured was insane at the time the application was made and the policy was issued, as alleged in the second paragraph of complaint, and therefore it does not come within the scope of the reasoning in the case cited. It is not claimed that the conversation with Dr. Kennedy was governed by the rules applicable to privileged communications. It was therefore competent to support the allegations of the second paragraph of complaint, if for no other purpose, and there was no error in admitting it. Dr. Logan was permitted to testify as to where he was on the day that the examination took place. This evidence was competent for the purpose of showing that he was available if Chester George made a good-faith effort to find him.

There was objection to a number of questions upon the ground that the information sought to be elicited was not within the issues. This was upon the ▆▆▆▆ theory that fraudulent collusion was not within the issues. But, as we have pointed out, evidence of collusion was properly admitted. There were objections to questions upon cross-examination, on the theory that the information sought to be elicited was part of written rules and regulations, and that the rules and regulations themselves were the best evidence. But the questions sought to discover whether the witness was familiar with the rules. It was in cross-examination, the latitude of which rests in the sound discretion of the court, and it is not shown that there was an abuse of discretion. Objections were sustained to questions which called for evidence, which was clearly competent, concerning facts which had already been established by other evidence, and concerning which there was no controversy. It is not error for a court in its discretion to exclude cumulative evidence of material facts which are not in dispute. Appellants asked Dr. Metcalf if it

was not a fact that he forgot to put in the information about the dead brother. An objection was sustained. Dr. Metcalf testified fully as to what occurred at the time the application blank was prepared. It appears from his testimony that he did not remember whether or not he had put the facts in the application blank. A statement by him as to why he had not put the facts in, if he did not remember whether or not they were in the application, would be pure conclusion and conjecture. The evidence was properly excluded.

Judgment affirmed.