**FLEETWOOD CORPORATION and Reginald E. Brown, Appellants (Defendants Below),**

v.

**Ernest MIRICH, Pasquale J. Amico, John G. Kolettis, Charles J. Yast and Eugene Leman, Appellees (Plaintiffs Below).**

No. 3–177A33.

Court of Appeals of Indiana, Third District.

May 14, 1980.

Terrance L. Smith, Anthony DeBonis, Jr., Murphy, McAtee, Murphy & Costanza, East Chicago, for appellants.

Nick Katich, Addison, Stoner, Stiles & Katich, Merrillville, for appellee Ernest Mirich.

James T. Walker, Merrillville, for appellees Pasquale J. Amico, John G. Kolettis and Charles J. Yast.

Robert F. Peters, Lucas, Clifford & Holcomb, Merrillville, for appellee Eugene Leman.

HOFFMAN, Judge.

This is an appeal from an action by plaintiffs-appellees Ernest Mirich, Pasquale Amico, John Kolettis, Charles Yast and Eugene Leman against defendants-appellants Reginald Brown and Fleetwood Corporation (Fleetwood) to recover damages for fraud. Plaintiffs charged that Brown falsely represented that all shareholders were required to sell their stock at $500 per share and further misled them as to the source of the funds used to purchase the shares. Plaintiffs also complained of Brown's failure to disclose an appraisal of the corporation's assets which would have reflected a higher value of the stock's worth. As a result of Brown's fraudulent conduct plaintiffs alleged that they were induced to sell their stock in Fleetwood at a price substantially below its fair market value. Liability on Fleetwood's part was predicated on the basis that it ratified Brown's actions and that he was acting within the scope of his authority as the corporation's agent.

Following a jury trial, judgment was rendered for the plaintiffs against both defendants. The central issue to be considered on appeal is whether there was suf-

ficient evidence to support the elements of actionable fraud.

An examination of the evidence adduced at trial reveals that Fleetwood was organized in 1967 and among its initial investors were the plaintiff doctors. Its primary business activity was the operation of an extended health care clinic known as the Ross Care Center. From its inception Fleetwood was plagued by mismanagement and in 1969 its financial condition had so deteriorated that bankruptcy proceedings were contemplated. It was at this time that the Fleetwood Board of Directors hired Brown as administrator.[1] Through his efforts the financial picture steadily improved and Fleetwood enjoyed outstanding profits during the 1970 71 and 1971 72 fiscal years. In 1970–71 the net retained earnings were $105,000 and by the end of the 1971 -72 fiscal year those earnings had increased to $316,000. At no time prior to the challenged sales though were any dividends paid to the shareholders.

In 1971 plans were developed by Fleetwood to expand the Ross Care Center from 50 beds to 180 but in order to implement this project outside financing was needed. Consequently, Fleetwood applied for a loan through the First Federal Savings and Loan Bank in Chicago. As part of the loan application process Fleetwood was required to submit a current appraisal of its assets and Charles Dodson was engaged for this purpose. His first appraisal estimated the fair market value of the property at $560,000 but this was not high enough to secure the loan. So around the first part of November Dodson returned another appraisal re-evaluating the property at $778,500.

On November 16, 1971 Fleetwood held its annual shareholders' meeting. One of the resolutions which passed read as follows:

"RESOLVED, That the officers of the corporation are granted authority to sell the net fixed assets of the Fleetwood Corporation for a price that will yield to the shareholder an amount not less than $500.00 per share." (hereinafter referred to as the November resolution)

Around April 21 ·24, 1972 Brown met individually with each of the plaintiffs and told them that pursuant to the November resolution they were obligated to sell their stock at $500 per share. Brown testified that he worded his presentation so that the plaintiffs would get the impression that they had to sell. Brown told Mirich that he had obtained a loan from his brother in Florida while he told the others that he was acting on behalf of a Florida syndicate. In Leman's case Brown intimated that he too was selling his stock. Brown then executed purchase agreements with the plaintiffs. These agreements provided:

### "PURCHASE AGREEMENT

"As outlined by the majority vote of the stockholders at the last annual meeting of the Fleetwood Corporation on November 16, 1971, the Board of Directors was authorized and directed to sell Fleetwood Corporation to any qualified buyer for a sum that would yield $500.00 per share of stock.

"In accordance with the above motion duly made and passed by a ⅔ majority I, the undersigned, do hereby declare myself a qualified buyer and herewith purchase all outstanding stock of the Fleetwood Corporation under the following terms and conditions:

1. Upon delivery of 50% of such outstanding shares, I shall assume complete control of all operations of the Fleetwood Corporation.

2. I accept the terms of the November 16, 1971 stockholders' resolution and hereby purchase all shares of stock of the Fleetwood Corporation, with immediate subsequent redemption of such acquired shares by the treasury of Fleetwood Corporation.

3. Each shareholder shall surrender his stock certificate to the secretary of Fleetwood Corporation, whereupon he will be issued a check for $500.00 per share.

---

1. He subsequently became a director and secretary-treasurer.

4. As evidence of good faith, I deliver to each shareholder the sum of $100.00 herewith as a binder which is forfeited in the event I do not make the stipulated payment.

5. The above offer is in no way connected with nor dependent upon the contract now in existence with the current administrator of the Ross Care Center.

6. The surrender of shares and payment therefor shall be executed within thirty (30) calendar days from the date set forth below."

On May 10, 1972 the Fleetwood Board of Directors held a meeting and agreed to buy the purchase agreement options from Brown. It appears that Brown had written corporate checks payable to the plaintiffs for the balance of the purchase price prior to the Board's actions. Nevertheless, he insisted that he had executed the purchase agreements on behalf of himself only. There was also some testimony that Brown instructed Fleetwood's bookkeeper not to discuss the redemption with anyone. On October 1, 1972 Fleetwood qualified itself as a Subchapter S corporation and began distributing its retained earnings to the five remaining shareholders including Brown.

Having carefully reviewed the entire record it is apparent that the verdict of the jury cannot be disturbed. The evidence discloses a fraudulent course of conduct designed to redeem the plaintiffs' stock at less than fair market value so that Fleetwood could qualify as a Subchapter S corporation. The general purport of Subchapter S is to permit closely held corporations an elective treatment under which the corporation is not subject to tax on its income but instead the shareholders are subject to tax on that income whether distributed to them as a dividend or retained in the corporation. *See generally*, I.R.C. §§ 1371–1379. Thus, the Subchapter S rules eliminate double taxation of earnings. Under the code provision in effect during 1972 a Subchapter S corporation could have no more than ten shareholders. I.R.C. 1371.[2] In the case at bar, by reducing the number of shareholders to ten or less the remaining shareholders could enjoy the favorable tax advantages of a Subchapter S election.

 To sustain an action for fraud it must be proven that a material representation of a past or existing fact was made which was untrue and known to be untrue by the party making it or else recklessly made and that another party did in fact rely on the representation and was induced thereby to act to his detriment. *Plumley v. Stanelle* (1974), 160 Ind.App. 271, 311 N.E.2d 626; *Physicians Mut. Ins. Co. v. Savage, Extr.* (1973), 156 Ind.App. 283, 296 N.E.2d 165; *Grissom v. Moran* (1972), 154 Ind.App. 419, 290 N.E.2d 119. Moreover, the failure to disclose all material facts by one on whom the law imposes a duty to disclose constitutes actionable fraud. *Grow v. Retired Teachers Comm.* (1971), 149 Ind. App. 109, 271 N.E.2d 140.

Defendants submit there is a total lack of proof that Brown misrepresented the source of the funds used to purchase the plaintiffs' stock since the evidence demonstrates that he intended to buy the shares for himself and then redeem them. At trial Brown testified that his brother in Florida had arranged the financing for the purchase but that a condition of the deal was that all of the shareholders would agree to sell their stock. Insofar as some of the shareholders refused to sell, the financing was never secured. In order to recoup the earnest money that he had paid for the options, Brown contacted the Board of Directors for Fleetwood and proposed that the corporation acquire the options. This proposal was subsequently adopted by the Board.

However, there was substantial evidence of probative value to underpin a conflicting inference that Brown as a director, officer and managing administrator was acting on behalf of the corporation all along and that there never was any outside financing. In

**2.** Pub.L. 94–455, § 902(a)(1) amended Code Sec. 1371(a)(1), applicable to taxable years beginning after December 31, 1976, so as to increase the maximum number of shareholders to fifteen.

his deposition taken July 16, 1974, nearly two years before trial, Brown stated that he could not recall from whom he attempted to obtain financing or whether he had ever tried to secure a loan for the purchase.[3] During final argument his counsel sought to downplay the significance of the inconsistencies between his deposition and trial testimony by suggesting that Brown was only "playing games" with plaintiffs' counsel at the deposition. But the jury could believe that Brown was caught in a web of lies.

Brown told Mirich that he was the purchaser while he told the other plaintiffs that a Florida syndicate was the buyer. In Leman's case Brown said that he too was selling his stock to the outside source. Significantly Brown had prepared corporate checks payable to various plaintiffs for the purchase prior to the Board meeting authorizing Fleetwood to accept Brown's options. Mirich was not informed of the purpose of this Board meeting even though he was one of the directors. He arrived late for the meeting and not until it was over did he learn of the Board's decision. Additionally, the purchase agreements referred to the fact that Brown would assume control of Fleetwood upon acquiring 50% of the stock yet Brown's own testimony was that he needed 100% or else no financing.

Doctor Shapiro, who was another of the directors that did not sell, testified that he signed a purchase agreement and received a check for $100 as earnest money from Brown but no check was introduced into evidence. In fact it seems clear that Shapiro never received any such check. Brown testified that he paid out $900 in earnest money. The stock records show that nine shareholders sold their stock between May 10–16, 1972. Since Brown paid $100 in earnest money to each of these nine shareholders then this accounts for his $900 expenditure and casts suspicion on Shapiro's testimony.[4]

3. This testimony is even more suspicious in light of the fact that Brown needed to borrow over $400,000 to effect the purchases.

4. There was also evidence that the minutes of the annual shareholders' meeting in 1971 indicated that a resolution had been passed autho-

The standard to be employed in reviewing a jury verdict does not permit an appellate tribunal to weigh evidence or resolve credibility of witnesses. The inquiry on appeal is limited to determining whether the verdict is sustained by substantial evidence of probative value. *Montgomery Ward v. Tackett* (1975), 163 Ind.App. 211, 323 N.E.2d 242. Here there was sufficient evidence introduced at trial from which the jury could have found that Fleetwood was to be the purchaser of the stock and that Brown misrepresented this fact.

Certainly this misrepresentation as to the identity of the purchaser was material. Each of the plaintiffs was an original investor in Fleetwood yet the corporation had not paid any dividends from its inception in 1967 up to and including 1972 when these disputed sales occurred. There was also testimony that no dividends were paid out in 1971 because Fleetwood needed its retained earnings for expansion purposes. Lastly, plaintiffs testified that they would not have sold their stock if they had known that the corporation was the purchaser.

Next, it is asserted that plaintiffs were not entitled to rely on Brown's statement that they were obligated to sell their stock because it was only his personal opinion. It should be observed that the mere fact that a statement takes the form of an expression of opinion is not always conclusive.

"The rule that actionable fraud cannot be based upon the mere expression of an opinion has been qualified until now, an expression of an opinion may amount to fraud where it is a mere contrivance of fraud, or if the person to whom it was expressed has justly relied upon it and has been misled, or when it is coupled with other circumstances.

\* \* \* \* \* \*

rizing the secretary of Fleetwood to repurchase stock from the shareholders' at book value, plus an amount to be determined by the Board. No one at trial could recall whether the Board had made any such determination.

" 'Where a party represents a material fact to be true to his personal knowledge, as distinguished from belief or opinion, when he does not know whether it is true or not, and it is actually untrue, he is guilty of falsehood, even if he believes it to be true; and if the statement is thus made with the intention that it shall be acted upon by another, who does so act upon it to his injury, the result is actionable fraud.' "

*Rochester Bridge Co. v. McNeil* (1919), 188 Ind. 432, at 438–439, 122 N.E. 662, at 664.

*Vernon Fire & Cas. Ins. Co. v. Thatcher et ux.* (1972), 152 Ind.App. 692, at 707, 285 N.E.2d 660, at 669, is also instructive on the distinction between opinion and representation of fact. There it was said:

"The Company also argues that the statements made by its agent and its field representative were merely expressions of opinion. Nothing more is offered to support that characterization than its mere assertion. We recognize, however, that the legal effect of a contract, or of a particular provision of a contract, can often be a matter of uncertainty. In such a case one may in all honesty, candor, and sincerity, state his opinion predicting the ultimate interpretation without thereby making a statement of fact. But what may subjectively be merely an opinion can, nevertheless, be stated as a present existing fact. If the statement thus made as a representation is not true but is *justifiably* relied on as being true, deceit has been practiced. If damage results, liability cannot be avoided on the ground that what was stated as a fact was subjectively intended as merely an opinion." [Original emphasis]

■ To establish that plaintiffs relied upon the false representations of Brown an express statement of reliance is not essential. Rather, the fact of reliance may be shown by other evidence from which such an inference can be drawn. *Sriver v. Maley* (1958), 128 Ind.App. 619, 151 N.E.2d 518.

Here, the record discloses that Brown served as a director and officer of Fleetwood and managed the Ross Care Center as its chief administrator. Under his helmsmanship he had transformed a lagging business into a thriving concern. He was a principal actor in all negotiations involving Fleetwood and had its lawyers and accountants at his disposal. Brown made no attempt to show that his statement regarding the effect of the resolution was only his personal opinion. On the contrary he couched his language and fashioned his presentation to the plaintiffs in such a manner so as to convey the impression that they were required to sell. None of the plaintiffs expressed a desire to sell and it was only after Brown's representation that they signed the respective purchase agreements. Whether the resolution directing that the net fixed assets of Fleetwood be sold at a price netting each shareholder $500 a share actually obligated the plaintiffs to sell their stock was a fact which Brown would have know via the various positions he held with the corporation. If he was only subjectively expressing his opinion then he was reckless in stating it as a fact without first having ascertained its truth.

That this statement was false cannot be seriously questioned. The resolution authorized the sale of the net fixed assets of Fleetwood. Testimony indicated that the term "net fixed assets" means the gross fixed assets less any mortgages or other liens. Fixed assets were defined to include land, buildings, tangible equipment, machinery and vehicles. Securities were expressly excluded from the category of fixed assets. It was further shown that transactions involving the sale to or redemption by a corporation of stock are not classified as sales of net fixed assets.

■ The foregoing evidence entitled the jury to conclude that Brown's expression regarding the effect of the November resolution was stated as a present existing fact and that the plaintiffs justifiably relied on it as being true. Deception and reliance involve the state of mind of the victim. As such its existence or absence is a question for the trier of fact. Once resolved that

finding cannot be disturbed without a clear showing that it was not supported by the evidence. *Plumley v. Stanelle, supra; Smart & Perry Ford Sales v. Weaver* (1971), 149 Ind.App. 693, 274 N.E.2d 718. The defendants have not made the requisite showing.

Likewise, there is no merit in the proposition that plaintiffs should be barred from recovery because they failed to exercise due care to guard against fraud by failing to read the purchase agreements. These agreements recited in part that pursuant to the November resolution the Board of Directors was authorized and directed to sell Fleetwood to any qualified buyer for a sum that would yield $500 per share and that in accordance with this resolution Brown declared himself a qualified buyer. The agreements also stated that once all the shares had been purchased they would be redeemed by Fleetwood.

■ One relying upon a representation is bound to exercise ordinary care and diligence to guard against fraud. Nevertheless, this requirement of reasonable prudence in business transactions is not extended so as to permit an intentional fraud perpetrated on the the unwary. *Gonderman v. State Exchange Bank* (1975), 166 Ind.App. 181, 334 N.E.2d 724.

> " '[W]e consider that where it appears that one party has been guilty of an intentional and deliberate fraud, by which, to his knowledge, the other party has been misled, or influenced in his action, he cannot escape the legal consequences of his fraudulent conduct by saying that the fraud might have been discovered had the party whom he deceived exercised reasonable diligence and care.' "

*Rushville Natl. Bank, Tr. v. State Life Ins. Co.* (1936), 210 Ind. 492, at 503, 1 N.E.2d 445, at 450.

■ To knowingly misstate the contents of a writing and to purposely misstate facts which would cause the signing of the same is fraud. *Farm Bureau Mutual Ins. Co. v.*

*Seal, Admr.* (1962), 134 Ind.App. 269, at 281, 179 N.E.2d 760, at 765:

> "It has been said that:
>
> " '. . . if one knowingly misrepresents the contents of a writing or if the fact is established that the signee was lulled by fraud and deceit into omitting to read the document for himself a charge of fraud is maintainable in an action upon it in the hands of one, or whose agent misrepresented the contents of the document.' "

■ In *Capitol Dodge et al. v. Haley et al.* (1972), 154 Ind.App. 1, 288 N.E.2d 766, plaintiff had purchased an automobile from defendant under an installment contract. Defendant's salesman represented the fact that the terms of the contract included full liability insurance coverage when in fact it did not. In holding for the plaintiff on the theory of fraud the Court remarked at 769–770 of 288 N.E.2d:

> "While we might have concluded upon the facts of this case that Haley was not justified in relying upon Allen's representations and that Haley should have carefully read the contract, we nevertheless cannot say that such conclusion is required as a matter of law. A jury of reasonable minds might find as they did that Haley was entitled to rely upon Allen's representations even in the face of the particular contract language and even in view of its positioning upon the contract form and the fact that it was set out in red letters. The jury might have concluded, as was their fact finding prerogative, that Haley was lulled into not reading the insurance provisions of the contract by the prior affirmative representations made by defendant Capitol's salesman."

Evidence that Brown falsely represented the terms of the November resolution and the true identity of the buyer was sufficient to support an inference that he lulled some of the plaintiffs into not reading the purchase agreements and duped all of them into signing the documents. Therefore, even if plaintiffs arguably failed to exercise

due care that omission would not preclude recovery under the facts of this case.[5]

Defendants also claim that Mirich cannot be said to have suffered fraud in that he was a director of Fleetwood and in a position to know its inner workings. This assertion cannot stand. Where one director has superior knowledge of corporate affairs because he is intimately involved in the daily operations of the corporation while the other director has only a limited role in corporate management, the fiduciary duty is the same as if the latter were a stockholder not actively engaged in corporate affairs. *Sampson v. Hunt* (1977), 222 Kan. 268, 564 P.2d 489.

Another assignment of error raised by defendants is that Brown owed no fiduciary duty to disclose the Dodson appraisal to the plaintiffs because he was purchasing the stock for himself. Where a director of a corporation sells his personal shares or buys stock from other shareholders for his personal ownership, and such sale does not affect the general well being of the corporation, he owes no fiduciary duty to disclose information he possesses regarding the value of the stock to other shareholders. *The Board of Commissioners of Tippecanoe Co. v. Reynolds* (1873), 44 Ind. 509; *Yerke v. Batman* (1978), Ind.App., 376 N.E.2d 1211.

But a different legal situation exists where a director deals with a shareholder on behalf of the corporation. That this is a crucial distinction becomes apparent from the following passage in *The Board of Commissioners of Tippecanoe Co. v. Reynolds, supra,* 44 Ind. at 513–516:

" . . . It is said very frequently in the books that the directors of a corporation are trustees of the stockholders, and that the relation of trustee and *cestui que trust,* with its consequences, exists between them. But these expressions must always be understood to have relation to the cases to which they are applied, and not to be of universal application. It may be conceded that, in respect to the property of the corporation, whether it be land, money, securities, capital·stock, or other property held by the corporation, and the management of its business, the directors are trustees for the stockholders. The action of the directors in respect to the property of the corporation must affect, to a greater or less degree, the stockholders generally. It has been generally [sic] in such cases, or where the action of the directors has affected the whole body of stockholders, that the relation of trustee and *cestui que trust* has been held to exist. . . .

\* \* \* \* \* \*

"It seems to us, however, . . . that . . ., for some purposes, the directors of a corporation stand in a relation similar to that of trustees for the shareholders. This seems to be the case in reference to the management, by the directors, of the property and general affairs of the corporation. These are matters usually entrusted to the directors, and in respect to which they are empowered to act; and their action affects the whole body of shareholders, beneficially or injuriously, in respect to dividends upon, or the value of, their stock.

"But stock in a corporation held by an individual is his own private property, which he may sell or dispose of as he sees proper and over which neither the corporation nor its officers have any control. It is the subject of daily commerce and is bought and sold in market like any other marketable commodity. The directors have no control or dominion over it whatever or duty to discharge in reference to its sale and transfer, unless it be to see that proper books and facilities are furnished for that purpose. As the property of the individual holder, he holds it as free from the dominion and control of the directors, as he does his lands or other property. . . .

\* \* \* \* \* \*

---

5. This rationale applies with equal force to the contention that plaintiffs should have discovered the appraisal report prior to selling their stock.

"Such being the nature of the interest of the stockholder in his stock, and the directors having no control, power, or dominion over it or duty to discharge in reference to it, beyond the duty devolving upon them to prudently manage the affairs and property of the corporation itself, it seems to us to be very clear, that, in the purchase of stock by a director from the holder, the relation of trustee and *cestui que trust* does not exist between them." [Original emphasis]

Thus, directors of a corporation acting for the corporation in a purchase of its stock occupy a fiduciary relation in respect to the shareholder from whom the stock is purchased and are under a duty to disclose to the shareholder the facts affecting the value of the stock. *Wood v. MacLean Drug Co.* (1932), 266 Ill.App. 5. Since Brown was acting on behalf of Fleetwood he was guilty of fraud in withholding the information contained in the appraisal from the plaintiffs.[6]

To obviate this conclusion defendants assert that the appraisal was disclosed. They point to testimony by Ornelas and Shapiro that the appraisal was discussed and a copy made available for inspection at the annual stockholders' meeting on November 16, 1971. Additionally, they refer to a footnote contained in the 23-page audit report for the fiscal year 1970–71, a copy of which was given to each shareholder at the annual meeting, which states that an updated appraisal was presently being conducted.

Notwithstanding this several of the plaintiffs testified that no mention of the appraisal was made at the annual meeting nor had they seen a copy of the appraisal until around the time when this suit was filed even though Brown had it in his possession prior to the annual meeting. Since the evidence conflicts on this issue it was within the province of the trier of fact to believe the plaintiffs' version and that determination cannot be overturned on appeal.

Defendants also argue that Fleetwood did not ratify any fraud perpetrated

by Brown and that Mirich waived any claim of fraud by entering into a repurchase agreement. These arguments were not presented in the motion to correct errors and are therefore waived for purposes of appeal under Ind.Rules of Procedure, Trial Rule 59(G). *Heminger et al. v. Police Commission* (1974), 161 Ind.App. 72, 314 N.E.2d 827.

One other matter raised by this appeal merits attention. Plaintiffs have requested that pursuant to Ind.Rules of Procedure, Appellate Rule 15(G) additional damages be assessed against the defendants in an amount equal to 10% of the judgment because the issues presented in this appeal are frivolous.

Insofar as this appeal presents several close questions of law, plaintiffs' request is denied.

No reversible error having been shown, the judgment of the trial court is affirmed.

Affirmed.

GARRARD, P. J., and STATON, J., concur.

---

6. Taking into consideration this appraisal which valued Fleetwood's assets at $778,000, along with other well accepted accounting principles testified to at trial, the fair market value of the plaintiffs' stock was shown to be $775 per share.