**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Feb 18 2014, 9:18 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT
JONATHAN "SLADE" TAYLOR:

**TRAVIS W. MONTGOMERY**
Parr Richey Obremskey Frandsen & Patterson LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEES:

**ANDREW L. TEEL**
Haller & Colvin, P.C.
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

JONATHAN "SLADE" TAYLOR and )
MARK A. CASEY, )
     )
    Appellants-Plaintiffs, )
     )
        vs. )     No. 32A05-1305-PL-257
     )
ERIC "RICO" ELMORE and FATHEADZ, INC., )
     )
    Appellees-Defendants. )

APPEAL FROM THE HENDRICKS SUPERIOR COURT
The Honorable David H. Coleman, Judge
Cause No. 32D02-1109-PL-108

**February 18, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**SHEPARD, Senior Judge**

The CEO bought out the other shareholders at just a fraction of their investments by representing that the company was failing, neglecting to tell them that a big deal with Walmart was imminent. The trial court granted summary judgment for the CEO and the corporation on a complaint alleging fraud and other claims. We reverse.

FACTS AND PROCEDURAL HISTORY

Fatheadz, Inc., sells sunglasses designed for people with large heads. In 2008, Jonathan "Slade" Taylor invested $40,000 in the company and became one of its shareholders. At the time, other shareholders included Eric "Rico" Elmore, the CEO; Mark Casey, President; and Rico's brother Dan Elmore, Vice President.

Slade worked as Fatheadz's International Sales Director. In that role, he hired an attorney to draft an exclusive distributor agreement, traveled to Australia to meet with potential distributors, and established distribution arrangements there in anticipation of Fatheadz's future expansion overseas. Rico acknowledged in an email that Slade had "put in endless amounts of time including starting Fatheadz Australia." Appellant's App. p. 145. Slade believed he would be compensated for his work and reimbursed for his out-of-pocket expenses.

Slade also worked with Mark and Dan to assess the company's cash flow problems. They discovered that Rico put personal expenses on multiple credit cards that were being paid from Fatheadz accounts, that sales revenues were not being properly recorded, that the company had outstanding bills from law firms, and that it had been sued numerous times for failure to pay its trade creditors. In addition, in early 2009, Rico unilaterally changed Fatheadz's primary place of banking from Huntington National

2

Bank to another bank. Slade, Mark, and Dan repeatedly asked Rico for basic financial information such as the name of the new bank, the company's account number, and bank documents, but Rico denied their requests.

When Fatheadz continued to ignore good business practices, Mark and Dan decided to consult an attorney. The attorney agreed with their concerns and advised them to leave the company. In April and May 2009, Mark and Dan resigned from Fatheadz. Although their company shares were relinquished at that time, the purchase price for the shares was subject to further negotiations.

Slade did not resign. However, like Mark and Dan, he had stopped doing any work for Fatheadz by May 2009. For his part, Rico had stopped providing them with any information about the business. Indeed, without notice to Slade, Rico redistributed Mark's and Dan's shares to himself. Based on the ownership interests Rico listed in a 2008 email, his assumption of their shares easily gave him majority ownership.

In the summer of 2010, Rico contacted Slade, Mark, and Dan about selling the entire business in order to cut their losses. He complained about the headaches of operating the company, indicated that its financial affairs were in dire shape, and noted that creditors were attempting to collect on debts. He said he had found a third-party buyer, but to complete the transaction, the three men needed first to sell their shares back to Fatheadz. Rico claimed that proceeds from the buyer afforded Fatheadz the liquidity to buy back the shares. Still, he refused to reveal the name of the buyer, the amount for which Fatheadz would be sold, or any other details.

In June 2010, Slade, Mark, and Dan agreed to sell their shares. Slade, who had bought into the company for $40,000, agreed to sell his ownership interest for $5,000. Mark, whose total investment in Fatheadz exceeded $200,000, agreed to sell for $25,000. In December 2010, Rico told Mark that the purchase was completed and dropped off two checks, one to Mark for $25,000 and one to Slade for $5,000.

Rico actually never sold Fatheadz. Instead, he had become its sole owner, and Fatheadz had entered into a lucrative deal with Walmart. Rico knew about the Walmart deal as early as January 2010. *See id.* at 184 (Rico's email to potential third-party buyer: "Wal-Mart has committed to us for another two years and I feel we will knock [i]t out of the park this year with lower cost and a better price point."). But he never told Slade and Mark about it even as they sold their shares back to Fatheadz at a loss. *See id.* at 156 (Mark's affidavit: "Rico never disclosed to me that Fatheadz['s] previous courtship of Walmart was successful and that Walmart would be placing large orders with Fatheadz."). In fact, the source of Slade's $5,000 payment from Fatheadz did not come from a third-party buyer but from a $1,308,725 payment received from Walmart. Slade and Mark would have never sold their shares had they known that Rico was going to retain ownership and that there was a pending deal with Walmart. *Id.* at 142, 156, 179.

In addition, rather than being in dire shape, Fatheadz's financial situation had been improving at the time Slade and Mark sold their ownership interests. The company's net worth had improved from negative $327,156 in 2009, to negative $221,834 in 2010, to positive $59,859 in 2011.

4

In September 2011, Slade sued Rico and Fatheadz for fraud, violation of the Indiana Uniform Securities Act, and breach of fiduciary duties. He also made a quantum meruit claim.[1] Rico and Fatheadz moved for summary judgment and designated evidence. Slade responded and also designated evidence. Before the April 2013 hearing on the motion, Mark moved to intervene as a plaintiff, and the trial court allowed him to do so. Mark did not file anything regarding the summary judgment motion, but Rico and Fatheadz replied to Slade's response. The court entertained the parties' arguments at the hearing, and in May 2013, granted summary judgment for Rico and Fatheadz without specific findings or conclusions. Slade now appeals.[2]

## ISSUE

Did the trial court err by granting summary judgment for Rico and Fatheadz?

## DISCUSSION AND DECISION

Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C); *Dreaded, Inc. v. St. Paul Guardian Ins. Co.*, 904 N.E.2d 1267 (Ind. 2009). All facts established by the designated evidence and reasonable inferences drawn from those facts are construed in favor of the nonmoving party. *Naugle v. Beech Grove City Sch.*, 864 N.E.2d 1058 (Ind. 2007).[3]

---

[1] The complaint included two other counts, but they are not relevant here.

[2] Mark does not participate in this appeal.

[3] Rico and Fatheadz claim that Slade waived his right to sue for fraud, securities violations, and breach of fiduciary duty because he essentially challenges the price he received for his shares. They point out that the written agreement regarding the sale of his shares provided, "Slade hereby agrees and acknowledges

5

# I. FRAUD

To establish fraud, a plaintiff must show: (1) the defendant made a material misrepresentation of past or existing fact that (2) was untrue, (3) made with knowledge of or in reckless ignorance of its falsity, (4) made with the intent to deceive, (5) rightfully relied upon by the plaintiff, and (6) proximately caused the plaintiff injury or damage. *Kesling v. Hubler Nissan, Inc.*, 997 N.E.2d 327 (Ind. 2013).

The evidence most favorable to Slade shows that when Rico approached him in the summer of 2010 about selling Fatheadz due to its financial ruin, Slade had no way of evaluating the situation. Rico had already changed the company's bank and refused requests for financial information, and at the time he was trying to convince Slade to sell, he refused to identify the buyer or reveal any details of the sale.

Despite Rico's claim to have found a buyer, the designated evidence shows only two brief emails between Rico and the purported buyer, one from January 2010 and the other from February 2010, and both discuss Walmart's two-year commitment to Fatheadz. *See* Appellant's App. pp. 183-84. And although Rico complained to Slade that Fatheadz's financial affairs were in dire shape, Walmart's commitment is certainly an indication otherwise, as is his January 2010 email to the purported buyer in which he said he felt Fatheadz would "knock [i]t out of the park this year." *Id.* at 184. Rico never told Slade about Walmart's deal with Fatheadz even though his January 2010 email to the purported buyer shows he knew about it well before approaching Slade about selling.

that the purchase price set forth above represents the current Fair Market Value of the Company Shares and hereby waives the right to challenge this valuation in any forum or proceeding." Appellant's App. p. 83. We decline to find waiver because it is the very fraudulent acts alleged by Slade that caused him to sign the agreement to sell his shares.

6

Rico and Fatheadz nonetheless argue that there was no Walmart purchase order at the time Slade decided to sell his shares in June 2010. The record is unclear as to the precise timing of the Walmart order. Even if no deal had yet been consummated, though, Rico clearly knew it was imminent.

Rico and Fatheadz also argue that Slade's specific claims as set forth in his complaint asserted a much narrower set of facts that do not amount to fraud. Slade's complaint alleged that "Rico communicated to the other Fatheadz owners that he had identified and begun negotiations with a third party buyer for the corporation" and that "Rico stated that in order for the other owners to recoup a portion of their equity investment in the company, the owners must sell their Fatheadz stock to Rico." *Id.* at 12. Rico and Fatheadz point to the potential buyer's affidavit, which states that it entered into negotiations to buy Fatheadz in December 2009, that it had recommended to Rico that Fatheadz would need to reacquire any outstanding stock before it would consider the purchase, and that it decided not to acquire Fatheadz in late 2010. *Id.* at 60. Rico and Fatheadz argue that since there was in fact a potential buyer who wanted the other shareholders to sell back their shares before any purchase, Slade cannot show that Rico's statements were false.

Rico's alleged representations, however, also indicated that business was bad and that the only way Slade could cut his losses was to sell his shares back so the business could be sold. Slade has easily shown genuine issues of material fact by designating evidence that Rico convinced him to sell his shares at a loss so that Fatheadz could be sold, all while hiding that the business's financial affairs were actually improving and a

7

large deal had been made with Walmart. The trial court erred by granting summary judgment to Rico and Fatheadz on Slade's fraud claim.

## II. SECURITIES ACT

Under the Indiana Uniform Securities Act, "[i]t is unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly: (1) to employ a device, scheme, or artifice to defraud; (2) to make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading; or (3) to engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person." Ind. Code § 23-19-5-1 (2008).

Rico and Fatheadz argue that the only basis for Slade's Securities Act claim is Rico's representation that a possible buyer existed. That representation, they say, was not false.[4]

Slade's Securities Act claim, though, also incorporated the allegations made in the fraud count. Moreover, while the designated evidence shows that a potential buyer did in fact exist, there is a genuine issue of material fact as to whether Rico misrepresented how serious the buyer was. Slade believed from Rico's representations that the purchase was imminent and that the only major hurdle was that Fatheadz buy back its shares. The designated evidence, however, reveals only a brief affidavit from the buyer and two even

---

[4] We reject Rico and Fatheadz's assertion that Slade has waived his claim under the Securities Act for failure to present a cogent argument. Slade cited the appropriate statute, explained that his shares constituted securities, and incorporated his arguments regarding actual fraud.

briefer emails between Rico and the buyer, none of which show that the buyer ever came close to purchasing Fatheadz.

Rico and Fatheadz also argue that Slade's claim is barred by two defenses. First, they argue that Slade was *in pari delicto* with Rico and cite *Thomas v. Hemmelgarn*, 579 N.E.2d 1333, 1336 (Ind. Ct. App. 1991) ("A purchaser of stock securities is barred from asserting that the sale was invalid, because of a state securities regulation violation, if he is found to be *in pari delicto* with the seller. A purchaser is generally held to be *in pari delicto* with the seller if he participates in the organization or management of the issuing corporation."), *trans. denied*.

Rico and Fatheadz point to designated evidence they believe shows that Slade was sufficiently involved in the organization and management of Fatheadz that he is precluded from claiming a securities violation. But the evidence most favorable to Slade shows that he stopped doing any work for Fatheadz by May 2009, and Rico stopped providing him with any information about the business.

Second, Rico and Fatheadz note that the Securities Act provides a defense if "the seller knowingly participated in the violation." Ind. Code § 23-19-5-9(b) (2008). Rico and Fatheadz claim that Slade knowingly participated in the violation because he knew he lacked essential information but sold his shares anyway. They cite *B & T Distributors, Inc. v. Riehle*, 266 Ind. 646, 366 N.E.2d 178 (1977), in which the Supreme Court affirmed the trial court's determination that the sellers of a business did not commit a securities violation where the buyers were aware they did not have knowledge of the business's most recent financial reports but bought it nevertheless. *B & T Distributors*,

9

however, involved a decision after trial, where the finder of fact had the opportunity to weigh the evidence and assess the credibility of the witnesses. In contrast, it is enough to avoid summary judgment here that there is a question of fact about whether Slade knowingly participated in the violation. The trial court erred by granting summary judgment to Rico and Fatheadz on Slade's Securities Act claim.

## III. FIDUCIARY DUTIES

A corporate director acting for the corporation in a purchase of its own stock stands in a fiduciary relationship with respect to the shareholder from whom the stock is purchased and is under a duty to disclose to the shareholder the facts affecting the value of the stock. *Hardy v. S. Bend Sash & Door Co.*, 603 N.E.2d 895, 900 (Ind. Ct. App. 1992), *trans. denied*. Pursuant to this rule, Rico had a fiduciary duty to disclose to Slade the business's improving financial condition and the pending Walmart deal before buying back Slade's shares on behalf of Fatheadz.

Rico and Fatheadz argue that Rico had no fiduciary duty because he was actually buying the shares for himself, not for Fatheadz, and because he bought the shares from a fellow director, not just a shareholder. *See id.* ("[A] corporate director who . . . buys shares from other shareholders for his personal ownership owes no fiduciary duty to disclose information he possesses regarding the value of the stock to the other shareholders, provided that, such a sale does not affect the general well-being of the corporation.").

Rather than supporting the trial court's judgment, Rico and Fatheadz have only highlighted that a fact-finder must determine whether Rico bought the shares personally

10

or on behalf of Fatheadz. The evidence certainly shows that he represented he was buying them for Fatheadz. Moreover, "[w]here one director has superior knowledge of corporate affairs because he is intimately involved in the daily operations of the corporation while the other director has only a limited role in corporate management, the fiduciary duty is the same as if the latter were a stockholder not actively engaged in corporate affairs." *Fleetwood Corp. v. Mirich*, 404 N.E.2d 38, 46 (Ind. Ct. App. 1980). Slade's designated evidence shows that any role he had in corporate management had ended by May 2009, when he stopped working for Fatheadz and Rico stopped providing him with any information about the business. The trial court therefore erred by granting summary judgment on this claim.

## IV. QUANTUM MERUIT

Quantum meruit is a common law remedy that permits recovery where there is no contract but where the circumstances are such that "under the law of natural and immutable justice there should be a recovery as though there had been a promise." *Woodruff v. Ind. Family & Soc. Servs. Admin.*, 964 N.E.2d 784, 791 (Ind. 2012), *cert. denied*, 133 S. Ct. 233, 184 L. Ed. 2d 44 (2012). To recover on a theory of quantum meruit, a plaintiff must show: (1) the plaintiff conferred a benefit upon the defendant at the express or implied request of the defendant; (2) allowing the defendant to retain the benefit without restitution would be unjust; and (3) the plaintiff expected payment. *Id.*

Slade's complaint alleged he believed he would be paid for his work at Fatheadz but was instead uncompensated for his ten months of work, which included establishing

11

distribution plans in Australia. Rico himself acknowledged in an email that Slade "put in endless amounts of time including starting Fatheadz Australia." Appellant's App. p. 145.

Rico and Fatheadz defend summary judgment on this claim by citing Rico's affidavit that Fatheadz did not make a single sale and thus realized no measurable benefit as a result of Slade's efforts. The fact that no sales occurred does not mean that Rico and Fatheadz obtained no benefit. The court thus erred by granting summary judgment on this claim.

## CONCLUSION

We therefore reverse the trial court's judgment and remand for further proceedings.

VAIDIK, C.J., and BRADFORD, J., concur.