Ronald RUFF, Appellant–Plaintiff,

v.

CHARTER BEHAVIORAL HEALTH SYSTEM OF NORTHWEST INDIANA, INC., Appellee–Defendant.

No. 45A03–9802–CV–53.

Court of Appeals of Indiana.

Sept. 30, 1998.

Rehearing Denied Nov. 6, 1998.

Stephen Bower, Cohen & Thiros, Merrill-ville, for Appellant–Plaintiff.

Julia Blackwell Gelinas, Sandra Boyd Williams, Locke, Reynolds, Boyd & Weisell, Indianapolis, for Appellee–Defendant.

## OPINION

KIRSCH, Judge.

Ronald Ruff (Ruff) appeals the trial court's grant of Charter Behavioral Health System of Northwest Indiana, Inc.'s (Charter's) motion for summary judgment in his suit against it. On appeal, he raises several issues, which we restate as follows:

I. Whether the trial court erred in concluding as a matter of law that Ruff was not entitled to reformation of his contract with Charter.

II. Whether the trial court erred in holding as a matter of law that Ruff was not

entitled to any additional compensation under his contract with Charter.

We reverse.

## FACTS AND PROCEDURAL HISTORY

Ruff has a Ph.D. in psychology and was employed as a clinical psychologist and clinical director at a Charter facility in Michigan City, Indiana. His employment contract with Charter provided that he receive a base salary of $90,000 annually, plus 70% commission on revenues from all psychological testing he performed in excess of $15,000 per year. The facility at Michigan City closed, and the facility's CEO, Michael Brown, offered Ruff the same position at a Charter facility in Hobart, Indiana.

Ruff began work at the Hobart facility in early August 1996 without knowing what the terms of his employment would be. Sometime later, Brown notified Ruff that his employment contract had been prepared by Charter's central office and that Ruff needed to sign it. Brown did not review the terms of the contract with Ruff. Ruff signed the contract without reading it. The contract provided that Ruff would receive a $90,000 base salary annually, plus a 70% commission on all psychological testing done in excess of $108,000 per year.

Ruff was terminated by Charter effective December 24, 1996. He then brought suit to reform the contract, claiming that he had been fraudulently induced to sign the contract without reading it by Brown's representation that it was identical to his previous contract. He also sought a pro rata share of his commission based on psychological testing he performed from August 1996 until his termination. Both he and Charter moved for summary judgment. The trial court denied Ruff's motion for summary judgment and granted Charter's motion for summary judgment, finding that Ruff had an opportunity to read the contract but chose not to, that he was not coerced or tricked into signing it, and that no fiduciary relationship existed between Charter and Ruff. Ruff now appeals.

## DISCUSSION AND DECISION

■ Ruff appeals the grant of Charter's motion for summary judgment. Summary judgment is appropriate when the designated evidence demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). When reviewing a motion for summary judgment, this court applies the same standard utilized by the trial court, and we resolve any doubt as to a fact, or an inference to be drawn therefrom, in favor of the party opposing summary judgment. *Bamberger & Feibleman v. Indianapolis Power & Light Co.*, 665 N.E.2d 933, 936 (Ind.Ct.App.1996). We will affirm a trial court's grant of summary judgment if it is sustainable on any theory found in the evidence designated to the trial court. *Id.* Cross-motions for summary judgment do not alter our standard of review; rather, our inquiry remains whether a genuine issue of material fact exists which requires a trial on the merits. *Id.*

## I. Reformation of the Contract

■ In his complaint, Ruff sought reformation of the employment contract based on his claim that he was fraudulently induced to sign it by Brown's representations. In Indiana, equity has jurisdiction to reform written documents in only two well-defined situations: 1) where there is a mutual mistake—that is, where both parties mistakenly execute a document which does not express the true terms of their agreement; or 2) where there has been a mistake by one party, accompanied by fraud or inequitable conduct by the remaining party with knowledge of the other's mistake. *Ballew v. Town of Clarksville*, 683 N.E.2d 636, 640 (Ind.Ct.App. 1997), *trans. denied* (1998). A party seeking reformation on the grounds of fraud coupled with his unilateral mistake has the burden of proving the alleged fraud and his resultant mistake. *Kruse, Kruse & Miklosko, Inc. v. Beedy*, 170 Ind.App. 373, 397, 353 N.E.2d 514, 529 (1976).

■ To sustain an action for fraud, it must be proven that a material representation of a past or existing fact was made which was untrue and known to be untrue by the party making it or else recklessly made and that another party did in fact rely on the representation and was induced thereby to act to his detriment. *Fleetwood Corp. v. Mirich*, 404 N.E.2d 38, 42 (Ind.Ct.App.1980).

Fraud need not be proven by direct or positive evidence; it may be proven by circumstantial evidence, provided there are facts from which the existence of all the elements can be reasonably inferred. *Plymale v. Upright*, 419 N.E.2d 756, 760 (Ind.Ct.App.1981).

### A. Material misrepresentation of a past or existing fact

One of the elements of a cause of action for fraud is a material misrepresentation of a past or existing fact. *Fleetwood Corp.*, 404 N.E.2d at 42. Whether certain statements were made as asserted is on conflicting evidence a question of fact for the jury. *Plymale*, 419 N.E.2d at 760. Charter claims that Brown's representations were not actionable because they were merely an expression of his opinion. It cites cases which state that when the form of the statements and the subject matter regarding which, or the circumstances in which they were made are such that the statements cannot be construed as anything but an expression of opinion or belief, or a representation of law, it is proper for the court to so find and refuse to submit the cause to a jury. *Id.* at 760–61.

■ Here, Ruff alleges that Brown misrepresented the contents of the employment contract. To knowingly misstate the contents of a writing and to purposely misstate facts which would cause the signing of a document is fraud. *Fleetwood Corp.*, 404 N.E.2d at 45. This court has stated,

> "if one knowingly misrepresents the contents of a writing or if the fact is established that the signee was lulled by fraud and deceit into omitting to read the document for himself a charge of fraud is maintainable in an action upon it in the hands of one who, or whose agent misrepresented the contents of the document."

*Farm Bureau Mut. Ins. Co. v. Seal*, 134 Ind.App. 269, 281, 179 N.E.2d 760, 765 (1962) (quoting 23 AM.JUR. *Fraud & Deceit* § 96). Ruff alleges that Brown stated that the Hobart contract was identical to the Michigan City contract. Brown testified that he and another individual were responsible for calculating the "floor" for Ruff's commission. Thus, Brown had actual knowledge of the contents of the contract. We cannot say that, if true, Brown's representation to Ruff that the contracts were "identical" was pure-

ly an expression of opinion or belief, or a representation of law.

Brown testified that in the course of discussing the contract for the new position, Ruff asked if the payment structure for the psychological testing was going to remain the same. He answered that Charter would need to make adjustments for the volume differences, but the schedule of charges for the individual tests would remain the same. *Record* at 111. Brown stated, "[Ruff]'s communications to me indicated a desire for his total compensation package to not decline based on the possibility of achievable calculations, meaning he didn't want to take a pay cut." *Record* at 111. He also testified, "there may have been times where we said that the base salary was the same. There may have been times where we said how we would calculate the reimbursement per psych test was the same .... there was some sameness." *Record* at 112. By contrast, Ruff testified, "Best of my recollection is I said, 'Mike, is it the same contract?' he said, 'It's identical to Michigan City.'" *Record* at 134. The testimony of Ruff and Brown conflicts with regard to the conversation the two men had with regard to the Hobart contract. This conversation is critical because it is these representations upon which Ruff bases his claim for fraud. This conflicting evidence creates a genuine issue of material fact which precludes summary judgment.

### B. Ruff's reliance on Brown's statements

■ Other elements of actionable fraud include deception and reliance. *Fleetwood Corp.*, 404 N.E.2d at 44. Both involve the state of mind of the victim. *Id.* at 44. Whether the plaintiff acted in reliance upon the defendant's representation and whether the plaintiff was justified in doing so are on conflicting evidence questions of fact for the jury. *Plymale*, 419 N.E.2d at 760–61. The element of reliance has two distinct parts: the fact of reliance and the right of reliance. *Id.*

■ Charter claims that Ruff had no right to rely on Brown's representations in lieu of reading the contract himself. The right of reliance is tightly bound up with the duty of a representee to be diligent in safe-

guarding his interests. *Id.* at 762. The legal obligation that a person exercise the common sense and judgment of which he is possessed is a practical limitation on the actionability of various representations. *Id.* Where persons stand mentally on equal footing, and in no fiduciary relation, the law will not protect one who fails to exercise common sense and judgment. *Id.* As our supreme court has stated,

"A man who can read and does not read an instrument which he signs is, as a general rule, guilty of negligence, and so he is, if, being unable to read, he neglects to exercise ordinary prudence in requiring the instrument to be read to him."

*Robinson v. Glass*, 94 Ind. 211, 212 (1883). However, this principle is not applied in cases where a party is by trickery prevented from reading the document or by trust and confidence lulled into believing another's representation as to its character or content. *Plymale*, 419 N.E.2d at 762.

In this case, Ruff had worked for Brown at Charter's Michigan City facility and found him to be honest and forthright. The two men had an agreeable working relationship. Brown testified that Ruff did a good job. When Ruff first began work at Michigan City, he did not have a contract. Brown stated that he would try to negotiate with Charter's central office for a base salary plus additional compensation for Ruff. Ruff continued to work for Charter based on his belief that Brown could be trusted to act as he had promised. In that case, Brown performed exactly as he said he would, and several months later, Ruff received the contract he had anticipated. Shortly thereafter, Ruff received the offer from Brown to move with him to the Charter Hobart facility. Based on their prior working relationship, Ruff testified that he had no reason not to trust Brown. Again, Ruff began working without a contract based on a "handshake" agreement between the men. We cannot say that as a matter of law Ruff had no right to rely on Brown's representations. Whether Ruff acted in reliance on Brown's representation and whether he was justified in doing so are questions of fact that preclude summary judgment.

■ Charter also argues that the parol evidence rule barred any evidence of oral representations about the contract. An ex-

ception to the parol evidence rule applies in the case of fraud in the inducement. *See Vernon Fire & Cas. Ins. Co. v. Thatcher*, 152 Ind.App. 692, 701, 285 N.E.2d 660, 666 (1972), *trans. denied* (1973). Because Ruff has alleged fraud, the parol evidence rule does not bar extrinsic evidence concerning the circumstances surrounding the execution of the contract.

## II. Additional compensation

■ Ruff also claims that Charter owes him additional compensation based on the terms of his employment contract. With regard to compensation, Ruff's contract provided as follows:

"2. **TERM AND TERMINATION**

(a) **Term.** The term of this Agreement will be for one (1) year from August 5, 1996 and this Agreement will be self-renewing for additional one (1) year terms unless the Hospital or Psychologist terminates this Agreement as provided herein. Notwithstanding the preceding sentence, this Agreement may be terminated by either party at any time, without cause, upon no less than sixty (60) days notice to the other party. If the Hospital terminates the Agreement, the Hospital may direct Psychologist to immediately cease providing services, although the Hospital will continue to be obligated to pay Psychologist those amounts due pursuant to Section 7 during the notice period.

. . . .

7. **COMPENSATION**

(a) **Base Salary.** Psychologist shall receive and Hospital shall pay a base salary at the rate of ninety thousand dollars ($90,000) per year (the "Base Salary"), payable in accordance with the Hospital's standard payroll policies.

(b) **Professional Fees.** Under the terms of this Agreement, Hospital will bill for, collect and retain all fees for Psychologist's services rendered to all patients treated by Psychologist, provided, however, that Hospital agrees to pay to Psychologist as additional compensation hereunder seventy percent (70%) of all net collections exceeding one hundred

eight thousand dollars ($108,000) for Psychological testing. Psychologist shall not participate in any Hospital bonus plan. Upon the termination of this Agreement for any reason whatsoever, Hospital will continue to bill and collect on behalf of Psychologist, all of Psychologist's then outstanding accounts receivable from Psychologist's clinical practice at the Hospital for a period of one hundred eighty (180) days after such termination. Upon expiration of the Agreement, all uncollected accounts will be the property of the Hospital."

*Record* at 26, 29.

Ruff was paid his base salary for the time he worked at Hobart Charter. At issue is whether he earned any commission under the contract. Charter claims that Ruff is entitled to no additional compensation because the commission due Ruff was figured and payable only when net collections exceeded $108,000. Because Ruff did not work for Charter Hobart until he had generated billing in that amount, he had not earned the commission. By contrast, Ruff argues that the $108,000 figure is based on annual revenues for psychological testing and can be pro-rated monthly to figure the commissions he earned for the five months he was employed at Charter Hobart. He also claims that he is entitled to treble damages under IC 22–2–5–2.

The intention of parties to a contract is to be determined from the four corners of the document. *McCae Management Corp. v. Merchants Nat'l Bank & Trust Co. of Indianapolis,* 553 N.E.2d 884, 887 (Ind.Ct. App.1990), *trans. denied.* It is expressed by the clear language thereof. *Id.* It is the duty of the court to interpret a contract so as to ascertain the intent of the parties. *Id.* In most cases, construction of a contract is a question of law. *Id.* But if the contract is ambiguous or uncertain in its terms, then extrinsic circumstances and rules of contract construction may be employed to help construe the contract and ascertain the intent of the parties. *Rieth–Riley Constr. Co. v. Auto–Owners Mut. Ins. Co.,* 408 N.E.2d 640, 645 (Ind.Ct.App.1980). The test for determining the existence of an ambiguity is whether reasonably intelligent persons could come to different conclusions as to the contract's meaning. *Shahan v. Brinegar,* 181 Ind.App. 39, 46, 390 N.E.2d 1036, 1041 (1979). Any ambiguities in a contract are to be strictly construed against the party who employed the language and who prepared the contract. *Rieth–Riley Constr. Co.,* 408 N.E.2d at 645. In determining the intention of the parties to a contract,

"it is the court's obligation and duty to consider their intention in the light of the surrounding circumstances which existed at the time the contract was made. The court should consider the nature of the agreement, together with all the facts and circumstances leading up to the execution of the contract, the relation of the parties, the nature and situation of the subject matter, and the apparent purpose of making the contract."

*Shahan,* 181 Ind.App. at 46, 390 N.E.2d at 1041.

Here, the contract provides that its term is one year from August 5, 1996. It also provides that Ruff's base salary was to be paid in accordance with Hospital payroll procedures. It, however, makes no mention of how Ruff's commission was to be earned or paid. We find that the contract is ambiguous on its face as to how Ruff's commission was earned and was to be paid. Extrinsic evidence concerning the intention of the parties must be presented to resolve this ambiguity. The interpretation of this provision is a question of fact for the trier of fact that precludes summary judgment.

Reversed.

STATON and ROBB, JJ., concur.