## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 11 2016, 8:35 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Harold Abrahamson
Jonathan E. Halm
Abrahamson, Reed & Bilse
Hammond, Indiana

ATTORNEY FOR APPELLEE

Margo R. Babineaux
Meinzer & Babineaux LLC
Saint John, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Keith A. Eenigenburg and
Sandra Eenigenburg,

*Appellants-Defendants*,

v.

Joan Andreotti,

*Appellee-Plaintiff*.

October 11, 2016

Court of Appeals Case No.
45A05-1601-CC-66

Appeal from the Lake Superior
Court

The Honorable Calvin D.
Hawkins, Judge

Trial Court Cause No.
45D02-1303-CC-149

**Brown, Judge.**

Keith A. Eenigenburg ("Keith") and Sandra Eenigenburg ("Sandra," and together with Keith, the "Eenigenburgs") appeal from the trial court's order in favor of Joan Andreotti. The Eenigenburgs raise four issues which we consolidate and restate as whether the court's order is clearly erroneous. We affirm.

### Facts and Procedural History

In 2001, Keith contacted Andreotti inquiring if she would be interested in selling the Eenigenburgs a twenty-two acre parcel of real property in Cedar Lake, Indiana (the "Property"). At the time, Andreotti had not listed the Property for sale but agreed to sell it to the Eenigenburgs, and on May 31, 2001, the parties entered into an installment sale contract (the "Contract") for a price of $650,000. Under the terms of the Contract, the Eenigenburgs paid Andreotti the sum of $5,000 as earnest money with an additional $195,000 to be paid at closing and a balance of $450,000 payable in monthly installments of $3,625.17 at an interest rate of seven and one-half percent commencing on July 1, 2001, and payable until "the full amount of the purchase price, together with interest has been paid." Plaintiff's Exhibit 1 at 2.[1] The Contract also provided that the Eenigenburgs were responsible for paying all real estate taxes on the Property. The Eenigenburgs paid Andreotti pursuant to the Contract's terms of payment until late in 2006 when Keith informed her that he was experiencing financial

---

[1] The Contract also provided that in "no event shall the term of the Contract exceed twenty (20) years." Plaintiff's Exhibit 1 at 2.

difficulties due to losing rental properties that he owned in Hammond, Indiana, to the City of Hammond. He requested that Andreotti modify the Contract's payment terms, and in December 2006 Andreotti agreed to reduce the Contract's interest rate to six and one-half percent effective January 1, 2007, which agreement was memorialized in an amendment to the Contract dated December 15, 2006, and reduced the Eenigenburgs' monthly payment to $2,800.

[3] In 2007, at around the same time that Andreotti agreed to reduce the Contract's interest rate, the Eenigenburgs listed the Property for sale for a price of $1,500,000. In 2010, Andreotti received a tax delinquency notice for the Property stating that the 2009 real estate taxes had not been paid, which resulted in a sum due of $27,860.51 inclusive of penalties and interest. Andreotti requested that the Eenigenburgs, pursuant to the Contract, pay the tax bill, and after they failed to do so, she paid the full amount of the 2009 tax liability. Throughout 2010, Keith informed Andreotti about his continuing financial hardship and requested that she reduce the interest rate on the Contract, and, in December 2010, Andreotti reduced the interest rate from six and one-half percent to five percent, which lowered the Eenigenburgs' monthly payment to $2,000.

[4]    In May 2011 the Eenigenburgs received an offer to purchase the Property from Jeffrey Lane and Mary Jo Wiltshire (the "Lanes").[2] Around Memorial Day of 2011, Keith informed Andreotti that the Lanes could pay a $300,000 down payment at closing. In June 2011, Keith gave Andreotti the $5,000 earnest money deposit he had received from the Lanes. In July 2011, Andreotti received a tax delinquency notice stating that for 2010, $2,953.79 were owed in taxes on the Property, which she then paid to Lake County. Also, in July 2011, the Eenigenburgs received an additional $50,000 down payment from the Lanes. On August 1, 2011, the Eenigenburgs and the Lanes closed on the sale of the Property at Meridian Title for a purchase price of $837,000 with $55,000 indicated as the down payment, which included the Lanes' initial $5,000 earnest money payment and their subsequent $50,000 down payment.[3] Andreotti was present at the closing but was situated in a separate conference room away from the Eenigenburgs and the Lanes. The Contract had an outstanding balance of $370,102.30.[4] Andreotti was presented with a warranty deed conveying the Property from Andreotti, as trustee of the Joan Andreotti trust to Sandra, which she signed, in exchange for a check for $290,000, and a

---

[2] Jeffrey Lane and Mary Jo Wiltshire married after they purchased the Property from the Eenigenburgs and Mary Jo uses Lane as her surname. Jeffrey Lane died on November 11, 2014.

[3] The contract between the Eenigenburgs and the Lanes lists a purchase price of $832,000 due to a $5,000 credit for preparation for a survey, which was a sum Andreotti loaned to Keith prior to the closing.

[4] Andreotti's amended complaint states that the amount she is owed under the Contract is $372,265.98, and she explained in trial that the discrepancy of $2,163.68 was due to an error in her calculations as she was transferring numbers from one ledger to another.

$5,000 promissory note in her favor by the Eenigenburgs.[5]  Andreotti was not aware of the additional $50,000 down payment the Eenigenburgs received from the Lanes until three weeks after the closing when the Lanes contacted her after the closing inquiring about the septic and grease traps on the Property, at which time they stated the full amount they had paid as a down payment.

[5] On March 25, 2013, Andreotti filed a complaint alleging breach of contract, unjust enrichment, breach of promissory note, and foreclosure of a common law lien.  On May 8, 2013, Andreotti filed a motion to dismiss her common law lien claim, and the court granted the motion that same day.  The Eenigenburgs filed an answer to Andreotti's complaint on June 28, 2013.  On August 15, 2013, Andreotti filed an amended complaint (the "Amended Complaint") which included a claim that the Eenigenburgs committed misrepresentation and fraud in the inducement based on their actions leading up to and at the closing.  The Eenigenburgs filed an answer to Andreotti's Amended Complaint, and around that time they paid Andreotti $2,000 on the unpaid balance of the promissory note.  On August 19, 2015, the court approved the parties' proposed pretrial order which contained the parties' stipulation of facts.  On October 19, 2015, the court held a one-day bench trial.  At the start of the trial, the Eenigenburgs, by counsel, requested that the court enter special findings

---

[5] Keith testified that, due to his financial problems, he "felt it was prudent on my part to just have [Sandra's] name on it."  Transcript at 109.  Andreotti also testified that Keith "had other financial problems and he wanted to avoid having any more liens put against him, so, therefore, he put [the deed] in his wife's name to protect himself."  *Id.* at 44.

pursuant to Ind. Trial Rule 52(A) which the court granted. Andreotti, Mary Jo, and Keith testified at the trial.

[6] Andreotti stated that initially she had "a good business relationship with the Eenigenburgs," Transcript at 31, and felt that she had "heartaches in common" with them. *Id.* at 38. She testified that around June of 2011 the Eenigenburgs received an offer on the Property and that "Keith came over with a $5,000 check" from the Lanes and told Andreotti that "[h]e didn't give me the actual amount when I asked him what they was paying. He said it was less that he had paid me. That he would not even be getting his down payment back." *Id.* at 35. Andreotti stated that Keith did not tell her what the actual price of the sale was but that "[h]e told around that," and did not at any point between the Lanes' offer and the August 1, 2011 closing mention that he had received an additional $50,000 deposit from the Lanes. *Id.* at 36. When asked whether she and Keith discussed a reduction in the outstanding balance on the Contract that was owed to her, Andreotti replied that "Keith came over repeatedly, and I told him I could not take less than what was owed because I had obligations to other people. . . . and I could not take less than the amount." *Id.* at 37-38. She testified that, at the closing, she was taken to an individual room, that the title company presented her with a warranty deed conveying the Property to Sandra, as well as a check for $290,000 and a $5,000 promissory note in her favor by the Eenigenburgs, and that she asked where the other parties were and was told they were in a separate room. Andreotti indicated that she was not presented with any closing documents, a HUD statement, or the contract between the

Eenigenburgs and the Lanes. She stated that Keith had previously told her that if she "did not accept the offer, we would lose the buyer," that the Lanes "could not come up with the balance of the money" due her, and that she "positively did not" know anything about the additional $50,000 the Eenigenburgs received because Keith "hid that quite well." *Id.* at 48. Andreotti further testified that she did not know either the contract price or the additional $50,000 the Lanes had paid the Eenigenburgs prior to the closing and that, as she was leaving the closing, she was introduced to the Lanes, who had asked to meet her, by a clerk from the title company, and that she was shown "nothing" in addition to the warranty deed that she signed, the check, and the promissory note. *Id.* at 49. Andreotti testified that some time after the closing, she spoke with Jeffrey and he stated to her, "that they could have come up with the full amount," and that she "did not know [Keith] had received another 50,000" until Mr. Lane told her what he had paid for the Property. *Id.* at 50.

[7] On cross-examination, Andreotti stated she had been involved in the real estate business since 1970, along with her husband when he was alive, which involved remodeling distressed properties and holding them for rental. She further stated that as part of her work in real estate she had prepared contracts and leases. Andreotti testified that, as to whether she had a conversation with Keith in the spring of 2011 regarding whether she would accept $300,000 as a "cash-out" in connection with the Property, she acknowledged that she had such a conversation, "[b]ut at the time, I told him I could not." *Id.* at 78-79. Andreotti stated that "she needed the full amount." *Id.* at 80. She acknowledged that in

2010 she had previously indicated to Keith that she would accept $300,000 if the purchase price on the sale was $650,000, and that Keith subsequently told her "many times" that he had found a purchaser who could pay a down payment of $300,000 cash but never stated the full purchase price. *Id.* at 81. Andreotti further testified that within a three-week period after the closing, she learned that the Lanes purchased the Property for $837,000, with $350,000 paid in total for the down payment, and that, until she spoke with the Lanes, she "was of the opinion [the purchase price] was less than he had - - the 650,000 he had paid me." *Id.* at 87.

[8] On redirect, Andreotti explained that in prior real estate closings at which she had participated she had always had the disclosure statements, HUD statements, closing statements, and all other closing documents before her. She further indicated that she had never participated in a closing where she was placed in a separate conference room, and she said that "there was a written document whereby [Keith] had written, requesting that I not be in the closing and that they not disclose the purchase price in his own writing." *Id.* at 91.

[9] The court asked Andreotti if she was forced by any party to sign the deed, and she stated that she was not, that there was no coercion, and she signed because of her "own mind and [her] circumstances." *Id.* at 95.

[10] Andreotti's counsel asked her on redirect to clarify the circumstances that caused her to sign the deed, and she stated:

> Well, my family situation; my son was dying. I had a lot of medical bills and things which I naturally was responsible for. I had two grandchildren I know I was going to have to try to educate, which being swindled out of this, my granddaughters did not go to college. Their children are in debt.

*Id.* at 96. She added that she felt pressure to sign the deed because "[Keith] told me if I did not accept the $300,000, we would lose the buyer." *Id.* at 97.

[11] On re-cross-examination, Andreotti was asked when Keith told her this, and she stated: "Repeatedly. He was at my house at least two or three times three days before closing." *Id.*

[12] Mary Jo testified that she has resided at the Property since the August 1, 2011 closing and that the Property was purchased from the Eenigenburgs. She stated that she and her husband initially paid $5,000 in earnest money and later paid Sandra an additional $50,000. Mary Jo testified that she first met Andreotti after she and her husband had signed all the closing documents and that her husband contacted Andreotti after the closing date regarding the condition of the Property. On cross-examination, she stated that in exchange for paying an additional $50,000 Keith reduced the interest rate on their contract.

[13] Keith testified that he and Sandra purchased the Property from Andreotti in 2001 pursuant to the Contract, listed the Property for sale in 2007 for $1,500,000 due to financial difficulty related to his and his brother's rental property business, acknowledged that Andreotti paid the real estate taxes due in 2009 and 2010, and that he had received two modifications to the interest rate.

He stated that prior to 2011 he had not received any other offers to purchase the Property and that when he received the Lanes' offer he told Andreotti about it around Memorial Day of 2011. Keith indicated that he discussed the terms of the offer with Andreotti, but when asked whether he told her the price of the offer, he replied "[p]rice? The total amount? No, I didn't." *Id.* at 126. Keith testified that he knew in May 2011 that the price "was going to be between 800- and 900,000," and added that he did not "think we would have gone any further with it had it been, you know, much lower." *Id.* at 127. He stated that he did not recall telling Andreotti that he was not receiving any more from the Lanes than the $650,000 purchase price of the Property, but he acknowledged that he was "thinking more of what I paid with the interest and everything" in determining what he meant by the price of the Property. *Id.*

[14] Keith stated that he did not know if he spoke to Andreotti within three days of the closing, that he spoke to Andreotti about the fact that she was taking less than what was due on the Contract, that he called Andreotti to inform her of the Lanes' down payment of $300,000, and that he received the additional $50,000 about three and one-half weeks after the original down payment offer of $300,000. He acknowledged that an amount greater than $300,000 was due on the Contract, but stated that he asked Andreotti if $300,000 "would satisfy her contract," that in June he presented her with a check for $5,000, and then in July he received an additional $50,000 check from the Lanes. *Id.* at 135. Keith stated that Andreotti told him he should "take the deal" offered by the Lanes for the Property and that, after Andreotti had accepted the deal, he began

discussing with George Burrell about whether Burrell had any properties for sale. *Id.* at 136.[6] Keith acknowledged that he received $55,000 in total from the Lanes, that his wife owns a property on Polk Street purchased from Burrell, and he acknowledged that Andreotti was kept separate from the Eenigenburgs and the Lanes at the closing. When asked whether he had asked anyone to refrain from telling Andreotti the actual purchase price, he replied, "I can't recall any discussion about purchase price. I didn't know it was that important," but acknowledged that he never told Andreotti about the purchase price. Regarding the additional $50,000 he received from the Lanes, the following exchange occurred:

> [Andreotti's Counsel]: Do you feel any obligation with respect to that $50,000 that you received from the Lanes? Did you feel any obligation to turn that over to Joan?
>
> [Keith]: I don't know - - you know, we made a purchase deal and we – you know, we made a purchase deal and we agreed to those terms and I don't know if it had to go beyond that point.

*Id.* at 143. Keith stated that he did not provide Andreotti with the contract the Lanes signed for the Property and that, at the time of the closing, he owed Andreotti "in the general area of around 370,000." *Id.* at 152.

---

[6] Keith was acquainted with Burrell because Burrell had performed maintenance work on some of Keith's rental properties.

[15] On cross-examination, Keith testified that the total amount he paid Andreotti for the Property, including principal and interest, was $896,763.26, that when he first met with the Lanes, Jeffrey "indicated to me at that time that he was only able to come up with $300,000," that he then called Andreotti to inform her of the $300,000 down payment, and that Andreotti "called us on the [Memorial Day] holiday and had indicated to take the offer." *Id.* at 159. He testified that, when Andreotti told him she would take $300,000 she did not express any conditions, and that, when Andreotti indicated her acceptance, the Eenigenburgs "celebrated with Subway sandwiches." *Id.* He stated that, at that time, the Eenigenburgs were making plans to move into Sandra's parents' home. Keith testified that in late June he met Burrell at a Casey's station in Cedar Lake about purchasing a house and that Burrell "suggested to me to go to my buyer and give them a reduction in interest on the contract if they could come up with an additional $50,000," and that in early July the Lanes agreed to pay an additional $50,000 in exchange for an interest rate reduction. *Id.* at 161. Keith stated that the deal he had with Andreotti for $300,000 was "already a finished process" and that the sale of the Property to the Lanes was not contingent on their ability to pay the additional $50,000. *Id.* at 166.

[16] Both during and after the trial, the parties submitted initial and supplemental affidavits of attorney's fees. On December 11, 2015, the court issued findings of facts and conclusions thereon and entered a judgment in favor of Andreotti in the amount of $72,265.98 and awarded her $9,611.11 in attorney fees. The court's order provides, in part, that:

## FINDINGS OF FACT

7. That at the closing in August 2011, [Andreotti] received the sum of Two Hundred Ninety Five Thousand ($295,000.00) Dollars from the Title Company and a promissory note from the [Eenigenburgs] in the sum of Five Thousand ($5,000.00) Dollars.

* * * * *

10. That prior to May of 2011, the [Eenigenburgs] had the [Property] on the market for sale. They received no offers until May 2011, at which time they received a purchase offer from the [Lanes].

11. That at that time the balance due on the [Contract] including the taxes paid by [Andreotti], was the approximate [sum] of Three Hundred Seventy Thousand One Hundred Two ($370,102.30) Dollars and Thirty Cents.

12. That the down payment on the purchase price offered by the [Lanes] for the [Property] was Three Hundred Thousand ($300,000.00) Dollars.

13. That [the Eenigenburgs] contacted [Andreotti] and advised her that this was the only offer they had received on the [Property] and the Three Hundred Thousand ($300,000.00) Dollars was the maximum amount that the [Lanes] could pay as a down payment, but it was not the actual offer. [Keith], conveyed this offer to [Andreotti] and asked her to think about it.

14. That over the Memorial Day weekend of 2011, the [Eenigenburgs] received a telephone call from [Andreotti] indicating that she would accept the sum of Three Hundred

Thousand ($300,000.00) Dollars in full payment of the [Contract] balance.

15. That the closing was scheduled for August 1, 2011.

* * * * *

21. That the [Eenigenburgs] did not disclose to [Andreotti] the actual purchase price or the terms of the real estate offer and contract that they agreed to with the [Lanes].

22. That, [Keith] told [Andreotti] that the total she would receive from the closing between the [Eenigenburgs] and the [Lanes] was the sum of Three Hundred Thousand ($300,000.00) Dollars even though the [Contract] balance between the parties as of the date of closing was about Three Hundred Seventy Thousand One Hundred Two ($370,102.30) Dollars and Thirty Cents, including the tax payments that [Andreotti] made in the sum of Thirty Thousand Eight Hundred Fourteen ($30,814.30) Dollars and Thirty Cents that [the Eenigenburgs] failed to pay.

23. That [Andreotti] never agreed, verbally or otherwise, to accept any amount less than what was due to her on the remaining principal balance on the [Contract] and the tax payments that she made that [the Eenigenburgs] failed to pay.

24. That the actual purchase price between [the Eenigenburgs] and the [Lanes] was Eight Hundred Thirty Seven Thousand ($837,000.00) Dollars.

25. That from May through August of 2011, [Andreotti] repeatedly asked [Keith] what the purchase price was for the contract with the [Lanes]; [Keith] never disclosed that price to [Andreotti] and would only suggest that he was losing money on

this deal and that he was not even getting the price that he paid for the [Property].

26. That from May through August of 2011, based upon the many conversations with [Keith], and the representations that he made along with his intentional omission of the purchase price and Fifty Thousand ($50,000.00) Dollars deposit, [Andreotti] believed that the [Lanes] agreed to a purchase price less than what the [Eenigenburgs] agreed to pay for the property, believed that the [Eenigenburgs] were in dire financial straits, that the [Eenigenburgs] had to move in with [Sandra's] parent's, that the [Eenigenburgs] were taking a loss on the property, that the [Lanes] would walk away if the [Eenigenburgs] did not follow through with the sale, and that the [Eenigenburgs] could no longer make payments on the contract with [Andreotti].

27. That up to the date of closing, August 1, 2011, [Keith], continued to make statements to [Andreotti] that the only cash that the [Lanes] could come up with was Three Hundred Thousand ($300,000.00) dollars despite the fact that the [Eenigenburgs] received an additional Fifty Thousand ($50,000.00) Dollars in cash from the [Lanes] in July, 2011.

28. That during the closing, a Meridian Title Representative presented [Andreotti] with a Deed to [Sandra]; [Andreotti] executed said Deed.

29. That thereafter a Meridian Title Representative presented [Andreotti] with a check in the sum of Two Hundred Ninety Thousand ($290,000.00) Dollars and a promissory note from the [Eenigenburgs] for Five Thousand ($5,000.00) Dollars.

30. That the sum of Seventy Two Thousand Two Hundred Sixty Five ($72,265.98) Dollars and Ninety Eight Cents, including the taxes, remained and still remain due and owing to [Andreotti].

## CONCLUSIONS OF LAW

\* \* \* \* \*

9.  [Andreotti] agreed to accept the sum of Three Hundred Thousand ($300,000.00) Dollars in full payment of the balance due under the [Contract] based upon the knowing misrepresentations of [Keith] about the sale price of the [Property] in question and the down payment on same.

10.  [Andreotti] is entitled to judgment against the [Eenigenburgs] based on their willful misrepresentations concerning the amounts that they were going to derive from the sale of the subject [Property] in the aggregate sum of Seventy Two Thousand Two Hundred Sixty Five ($72,265.98) Dollars and Ninety Eight Cents.

11.  The [Contract] entered into by and between the parties provided for attorney fees for the prevailing party.

12.  [Andreotti], as the prevailing party, is entitled to recover of and from [the Eenigenburgs] the sum of Nine Thousand Six Hundred Eleven ($9,611.11) Dollars and Eleven Cents for attorney's fees and costs, which the Court finds to be reasonable.

Appellant's Appendix at 12-17.

### Discussion

The issue is whether the trial court's findings of fact and conclusions of law entered pursuant to Ind. Trial Rule 52(A) are clearly erroneous. "Where a trial court has made special findings pursuant to a party's request under Trial Rule 52(A), the reviewing court may affirm the judgment on any legal theory

supported by the findings." *Mitchell v. Mitchell*, 695 N.E.2d 920, 923 (Ind. 1998). We may not set aside the findings or judgment unless they are clearly erroneous. *Menard, Inc. v. Dage-MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind. 2000), *reh'g denied.* In our review, we first consider whether the evidence supports the factual findings. *Id.* Second, we consider whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous if it relies on an incorrect legal standard. *Menard*, 726 N.E.2d at 1210. We give due regard to the trial court's ability to assess the credibility of witnesses. *Id.* While we defer substantially to findings of fact, we do not do so to conclusions of law. *Id.* We do not reweigh the evidence; rather we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Yoon v. Yoon*, 711 N.E.2d 1265, 1268 (Ind. 1999). We evaluate questions of law *de novo* and owe no deference to a trial court's determination of such questions. *Kwolek v. Swickard*, 944 N.E.2d 564, 570 (Ind. Ct. App. 2011) (citing *McCauley v. Harris*, 928 N.E.2d 309, 313 (Ind. Ct. App. 2010), *reh'g denied*, *trans. denied*), *trans. denied.*

[18]     The essential elements of fraudulent inducement are the same as those for any action on fraud: "The elements of actual fraud are: (1) a material misrepresentation of past or existing facts; (2) made with knowledge or reckless ignorance of falsity; (3) which caused the claimant to rely upon the misrepresentation to the claimant's detriment. *Massey v. Conseco Servs., L.L.C.*,

879 N.E.2d 605, 611 (Ind. Ct. App. 2008) (citing *Siegel v. Williams*, 818 N.E.2d 510, 515 (Ind. Ct. App. 2004)), *aff'd on reh'g*, 886 N.E.2d 581 (Ind. Ct. App. 2008), *trans. denied*. "One cannot be allowed, under the law, to *partially* disclose the facts as he knows them to be, yet create a false impression in the mind of the hearer by failing to fully reveal the true state of affairs." *Thompson v. Best*, 478 N.E.2d 79, 84 (Ind. Ct. App. 1985), *reh'g denied*, *trans. denied*. Fraud need not be proven by direct or positive evidence; it may be proven by circumstantial evidence, provided there are facts from which the existence of all the elements can be reasonably inferred. *Plymale v. Upright*, 419 N.E.2d 756, 760 (Ind. Ct. App. 1981).

[19] The Eenigenburgs argue that the trial court's findings are not supported by the evidence and do not provide a basis for the judgment against either Keith or Sandra. They maintain that the findings fail to specify which statements induced Andreotti to accept $300,000, including when the statements were made, whether they were false when made, whether they were material to Andreotti's decision to accept $300,000, and whether Andreotti "reasonably relied" on the statements to her detriment. Appellant's Brief at 16. The Eenigenburgs state that the court clearly erred in concluding that Keith induced Andreotti to accept the $300,000 and down payment terms because Andreotti did not "'reasonably rely' on any misrepresentations either concerning the Lanes' contract price, or the amount of their down payment." *Id.* at 25. They contend that Andreotti is "a sophisticated real estate investor, with 32 years experience in the industry," that she had previously participated in real estate

closings but did not examine the closing papers associated with the transaction at issue which would have disclosed to her the full purchase price and down payment, and failed to "independently investigate" the purchase price and down payment, and that no one had pressured her to sign the deed. *Id.* at 26-27.

[20] Andreotti asserts that the Eenigenburgs, despite her inquiries, intentionally omitted the purchase price and deposit in their contract with the Lanes which were the material misrepresentations that induced her to accept less than the full amount owed to her under the Contract. She further argues that, despite her requests for information about the purchase price in the Eenigenburgs' contract with the Lanes, the Eenigenburgs "repeatedly gave waffling answers," "never disclos[ed] the actual sales price, deposit, or sales contract," and "requested that the title company staff place [Andreotti] in a separate conference room without the closing documents during the closing" which supports the trial court's order in her favor. Appellee's Brief at 15-16.

[21] In reply, the Eenigenburgs assert that Andreotti's own financial circumstances, rather than any of Keith's alleged misrepresentations, led her to sign the deed. They also contend that no evidence was presented that she asked to be in the same room as the Eenigenburgs and Lanes, that she asked to review the closing documents, that she did not refuse to accept the settlement check on grounds that she should have received more money, and that she acknowledged that no one forced or pressured her to sign the deed.

The trial court entered findings consistent with the evidence. With respect to whether the findings support the judgment, in Finding 12 the court found that, around Memorial Day 2011, the Lanes offered $300,000 as the down payment, and in Finding 27 the court found that, in addition to the initial down payment offer of $300,000, "the [Eenigenburgs] received an additional Fifty Thousand ($50,000.00) Dollars in cash from the [Lanes] in July, 2011." Appellant's Appendix at 15. Findings 25, 26, and 27 all reference evidence which reveals that the parties had conversations in which Keith failed to specify the full amount of the purchase price to Andreotti prior to the closing. The evidence at trial shows that, in the context of the parties' dealings, the amount of the purchase price was material to Andreotti's decision to accept $300,000 instead of the full $372,265.98 remaining balance under the Contract. In 2010, Andreotti had stated to Keith that she would be willing to accept $300,000 if the purchase price on the sale was $650,000. At the time of their initial conversation over Memorial Day of 2011, Andreotti instructed the Eenigenburgs to proceed with the sale to the Lanes and that she would accept $300,000 in satisfaction of the full balance remaining under the Contract, Keith was aware that the full purchase price was going to be between $800,000-$900,000, and he represented to her that he was receiving only what he had paid for the Property.[7] Finding 21 also reflects this evidence and states that the

---

[7] Keith stated that he took receiving what he had paid Andreotti for the Property under the Contract to include accrued interest, which was a sum he presented to the trial court in a handwritten exhibit, titled Defendant's Exhibit A, containing his computation of the total amount he had paid Andreotti which showed that he had paid $896,763.26.

Eenigenburgs "did not disclose to [Andreotti] the actual purchase price or the terms of the real estate offer and contract that they had agreed to with [the Lanes]." *Id.* at 14. Three days prior to the August 1, 2011 closing, Andreotti testified that she met with Keith two or three times in the time after he had received the additional $50,000 from the Lanes, that he stated to her that if "she did not accept the 300,000 we would lose the buyer," but that he did not reveal he had received an additional $50,000 from the Lanes in July. Transcript at 97. Finding 27 reflects Andreotti's testimony that even prior to closing Keith did not reveal to her that the Lanes paid an additional $50,000 down payment.

[23] Based upon the evidence before it, the trial court could have reasonably concluded that Keith materially misrepresented past or existing facts, that he made the statements knowingly or recklessly, and that Andreotti relied upon the statements to her detriment. *See Fimbel v. DeClark*, 695 N.E.2d 125, 127-129 (Ind. Ct. App. 1998) (stating that where a buyer and a seller had conversations which imposed a duty to disclose the unsuitability of home lots for construction, an action for fraud can be supported where a party does not make full disclosure of the facts known to him which were relevant to the decision of another party to enter the transaction, and noting that if there is "any behavior of the seller which points affirmatively to a suppression of the truth or to a withdrawal or distraction of the other parties' attention to the facts, the concealment becomes fraudulent" (quoting *Ind. Bank & Trust Co. of Martinsville, Ind. v. Perry*, 467 N.E.2d 428, 431 (Ind. Ct. App. 1984))), *trans. denied*.

With respect to whether Andreotti's reliance was reasonable, the complaining party must have had a reasonable right to rely on the representations. *Westfield Ins. Co. v. Yaste, Zent & Rye Agency*, 806 N.E.2d 25, 31 (Ind. Ct. App. 2004), *trans. denied*.

> The legal obligation that a person exercise the common sense and judgment of which he is possessed is a practical limitation on the actionability of various representations. Where persons stand mentally on equal footing, and in no fiduciary relation, the law will not protect one who fails to exercise common sense and judgment.

*Ruff v. Charter Behavioral Health Sys. of Nw. Ind., Inc.*, 699 N.E.2d 1171, 1175 (Ind. Ct. App. 1998) (citations omitted), *reh'g denied*, *trans. denied*. Whether reliance was reasonable is usually a question for the trier of fact, but when "the evidence is so clear as to be susceptible of only one reasonable inference, it is for the court to determine as a matter of law whether [the party asserting fraud] was justified in relying on the representation and whether he was negligent in doing so." *Plymale*, 419 N.E.2d at 763 (*quoting* 37 C.J.S. *Fraud* § 129 (1943)). Whether reliance was justified is, on conflicting evidence, a matter for the trier of fact to determine. *Biberstine v. New York Blower Co.*, 625 N.E.2d 1308, 1316 (Ind. Ct. App. 1993), *reh'g denied*, *trans. denied*.

Andreotti testified that at the closing she was in a separate conference room and that "there was a written document whereby [Keith] had written, requesting that I not be in the closing and that they not disclose the purchase price in his own writing." *Id.* at 91. The Eenigenburgs did not object to this testimony.

She further testified that the title company representatives presented her with a warranty deed conveying the Property to Sandra, a check for $290,000, and a $5,000 promissory note in her favor by the Eenigenburgs. Andreotti indicated that she was not presented with any closing documents, such as a HUD statement, the contract between the Eenigenburgs or other documents that would have revealed the full price of the Eenigenburg-Lane contract and the full amount of the down payment. Based upon the record, we cannot say that Andreotti's reliance was unreasonable.

## *Conclusion*

We cannot say that the trial court's order concluding that Andreotti was fraudulently induced to accept less than the full amount owed to her under the Contract is clearly erroneous.

For the foregoing reasons, we affirm the court's order in favor of Andreotti.

Affirmed.


Baker, J., and May, J., concur.